# In the United States Court of Appeals for the First Circuit

---

**UNITED STATES OF AMERICA,**
*Appellee,*

v.

**ALEXIS D. NEGRÓN-CRUZ,**
*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the District of Puerto Rico
D. Ct. No. 11-cr-229-FAB
Hon. Francisco A. Besosa, U.S. Senior District Judge

---

## APPELLANT'S OPENING BRIEF

---

**RACHEL BRILL**
Federal Public Defender
District of Puerto Rico
241 F.D. Roosevelt Ave.
San Juan, PR 00918
T. (787) 281-4922
F. (787) 281-4899
E. Kevin_Lerman@fd.org

**FRANCO L. PÉREZ-REDONDO**
Assistant Federal Public Defender
Supervisor, Appeals Section

**KEVIN E. LERMAN**
Assistant Federal Public Defender

*Attorneys for Defendant-Appellant*
**ALEXIS D. NEGRÓN-CRUZ**

Authorities ..................................................................................... iii

Appellant's Opening Brief

Jurisdiction ......................................................................................1

Issues ............................................................................................. 2

Statement ........................................................................................3

Introduction & Summary of the Arguments................................. 21

Main Standards of Review ............................................................ 24

Arguments .................................................................................... 25

I.    The District Court Abused its Discretion When it Reimposed
Internet-Access Restrictions That Periodically Impose an
Impermissible, Absolute Internet Ban and Permit an Improper
Delegation of Authority to Probation Officers. ...........................25

    A.    Introduction....................................................................... 25

    B.    Legal Framework .............................................................. 27

    C.    Special Condition 31—as applied—is insufficiently tailored and
improperly imposes an absolute internet ban..................... 30

        1.    The internet is ubiquitous in daily life, and access to it is
a First Amendment right.................................................. 30

        2.    Special Condition 31's impairment of the right to
internet access is not narrowly tailored and is
insufficiently limited in temporal scope............................ 31

    D.    The re-imposition of Special Condition 31, as enforced, violates
Equal Protection. .............................................................. 32

    E.    As enforced by probation, Special Condition 31 improperly
delegates Article III authority............................................ 34

II.   THE DISTRICT COURT MADE A SIGNIFICANT, STRUCTURAL ERROR OF
      LAW WHEN IT EVALUATED THE REVOCATION AND PUNISHMENT
      DETERMINATION EX PARTE WITH THE PRIMARY FACT-WITNESS
      OFFICER WHO HAD TESTIFIED FOR THE GOVERNMENT AND
      PETITIONED THE COURT TO REVOKE SUPERVISED RELEASE. .......................36

      A.   Legal Framework .................................................................................36

      B.   The court's ex parte adjudication alongside a fact-witness
           probation officer was structural error undermining the Fifth
           Amendment right to a neutral and detached arbiter at a public
           hearing. ........................................................................................... 40

           1.   The fact-witness, quasi-prosecutorial probation officer
                crossed the investigator-adjudicator divide. ......................40

           2.   The fact-witness, quasi-prosecutorial probation officer
                was so involved in the investigative, percipient witness
                role that co-adjudication with the court created a
                heightened probability of bias or the appearance of bias. ...42

      C.   The neutral-and-detached-arbiter denial constitutes structural
           error. ..................................................................................................49

III.  THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT RELIED ON
      UNTESTED, DISPUTED, EX PARTE SUBMISSIONS FROM PROBATION. ............52

IV.   THE DISTRICT COURT MADE A SIGNIFICANT ERROR OF LAW WHEN IT
      DENIED THE DEFENSE ACCESS TO A PSYCHOLOGICAL EXAMINATION
      REPORT CONDUCTED BY A DEPARTMENT OF JUSTICE CLINICIAN. ...............53

V.    REMAND SHOULD BE TO A DIFFERENT JUDICIAL OFFICER. ..........................55

CONCLUSION...................................................................................................56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# AUTHORITIES

## U.S. SUPREME COURT AUTHORITIES

*Arizona v. Fulminante*,
499 U.S. 279 (1991) ................................................... 49

*Bearden v. Georgia*,
461 U.S. 660 (1983) ..................................... 30, 32, 34

*Bolling v. Sharpe*,
347 U.S. 497 (1954) ................................................... 30

*California v. Brown*,
479 U.S. 538 (1987) ................................................... 53

*Carpenter v. United States*,
585 U.S. 296 (2018) ................................................... 30

*Elrod v. Burns*,
427 U.S. 347 (1976) ............................................ 29, 32

*Gagnon v. Scarpelli*,
411 U.S. 778 (1973) ............................................ 37, 39

*Griffin v. Illinois*,
351 U.S. 12 (1956) ................................................... 33

*In re Murchison*,
349 U.S. 133 (1955) ........................................... 36, 47

*Lehr v. Roberson*,
463 U.S. 248 (1983) ................................................... 33

*Morrissey v. Brewer*,
408 U.S. 471 (1972) ............................................ *passim*

*Nixon v. Warner Commc'ns, Inc.*,
435 U.S. 589 (1978) ................................................... 54

*Offutt v. United States*,
348 U.S. 11 (1954) ................................................... 48

*Riley v. California*,
573 U.S. 373 (2014) ................................................... 30

*Tate v. Short*,
401 U.S. 395 (1971) ................................................... 33

*Tumey* v. *Ohio*,
273 U.S. 510 (1927) ........................................... 48, 50

*United States v. Johnson*,
529 U.S. 53 (2000) ................................................... 27

*Williams v. Illinois*,
  399 U.S. 235 (1970) ..................................................................32
*Withrow v. Larkin*,
  421 U.S. 35 (1975) ....................................................................36

**U.S. APPELLATE COURT AUTHORITIES**

*Mawson v. United States*,
  463 F.2d 29 (1st Cir. 1972) .......................................................55
*Parker Drilling Mgmt. Servs., v. Newton*,
  587 U.S. 601 (2019)...................................................................39
*United States v. Allen*,
  312 F.3d 512 (1st Cir. 2002) .....................................................34
*United States v. Bacon*,
  950 F.3d 1286 (10th Cir. 2020) ................................................54
*United States v. Becerra*,
  835 F. App'x 751 (5th Cir. 2021) .............................................29
*United States v. Clark*,
  784 F. App'x 190 (5th Cir. 2019)..............................................29
*United States v. Collazo-Castro*,
  660 F.3d 516 (1st Cir. 2011) ............................................. 43, 45
*United States v. Colón-Cordero*,
  91 F.4th 41 (1st Cir. 2024).........................................................55
*United States v. Crume*,
  422 F.3d 728 (8th Cir. 2005) ................................................. 28
*United States v. Duke*,
  788 F.3d 392 (5th Cir. 2015).............................................. 29, 32
*United States v. Eaglin*,
  913 F.3d 88 (2d Cir. 2019) ..................................................... 28
*United States v. Freeman*,
  316 F.3d 386 (3d Cir. 2003) ................................................... 28
*United States v. Holm*,
  326 F.3d 872 (7th Cir. 2003) ................................................. 28
*United States v. Johnson*,
  48 F.3d 806 (4th Cir. 1995) ......................................................34
*United States v. Matta*,
  777 F.3d 116 (2d Cir. 2015)..................................................... 28
*United States v. McLaurin*,
  731 F.3d 258 (2d Cir. 2013) ................................................... 28

*United States v. Meléndez-Santana,*
    353 F.3d 93 (1st Cir. 2003) ........................................ 35

*United States v. Morales-Negrón,*
    974 F.3d 63 (1st Cir. 2020) ........................................ 54

*United States v. Padilla,*
    415 F.3d 211 (1st Cir. 2005) (en banc) ...................... 49

*United States v. Perazza-Mercado,*
    553 F.3d 65 (1st Cir. 2009) ........................................ 25

*United States v. Peterson,*
    248 F.3d 79 (2d Cir. 2001) ........................................ 30

*United States v. Ramos-Carreras,*
    59 F.4th 1 (1st Cir. 2023)................................ 24, 52, 55

*United States v. Reccko,*
    151 F.3d 29 (1st Cir. 1998) ........................................ 39

*United States v. Reyes-Correa,*
    81 F.4th 1 (1st Cir. 2023) ............................... 15, 39, 52

*United States v. Sepúlveda-Contreras,*
    466 F.3d 166 (1st Cir. 2006) ...................................... 24

*United States v. Simmons,*
    343 F.3d 72 (2d Cir. 2003) ........................................ 36

*United States v. Sofsky,*
    287 F.3d 122 (2d Cir. 2002) ...................................... 28

*United States v. Vázquez-Rivera,*
    407 F.3d 476 (1st Cir. 2005) ...................................... 24

*United States v. White,*
    244 F.3d 1199 (10th Cir. 2001) ................................. 28

## U.S. Code Sections

18 U.S.C. § 3231 ..............................................................1
18 U.S.C. § 3553(a) ........................................................53
18 U.S.C. § 3583 .......................................... 1, 27, 36, 39
18 U.S.C. § 3583(d)(1) ...................................................27
18 U.S.C. § 3583(d)(2) ...................................................27
18 U.S.C. § 3742(a) ..........................................................1
28 U.S.C. § 1291 ..............................................................1
28 U.S.C. § 2106..............................................................55

**U.S. CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. V ...................................................................29

**U.S. SENTENCING GUIDELINES**

U.S.S.G. § 5D1.3(b) ............................................................. 27, 35

**FEDERAL RULES OF PROCEDURE**

Fed R. Crim. P. 32.1(b)(2) .........................................................37
Fed R. Crim. P. 32(e)(1) ............................................................38
Fed R. Crim. P. 32(e)(3) ............................................................38

**SCHOLARLY RESEARCH AND NEWS ARTICLES**

Hoofnagle, et al., *The Tethered Economy*,
    87 GEO. WASH. L. REV. 783 (2019) ............................................30
Jackson, *U.N. Declares Internet Access a Basic Human Right*,
    THE ATLANTIC, June 3, 2011.......................................................25
Tatelman, *Note: Give Me Internet or Give Me Death: Analyzing the
    Constitutionality of Internet Restrictions as a Condition of Supervised
    Release for Child Pornography Offenders.*,
    20 CARDOZO J.L. & GENDER 431, 433 (2014) ...............................25

**CASES FROM OTHER COURTS**

*State v. Stewart*,
    No. W2009-00980-CCA-R3-CD,
    2010 Tenn. Crim. App. LEXIS 691 (Tenn. Crim. App. Aug. 18, 2010) ...... 40

# In the United States Court of Appeals for the First Circuit

UNITED STATES OF AMERICA,
*Appellee,*

v.

ALEXIS D. NEGRÓN-CRUZ,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the District of Puerto Rico
D. Ct. No. 11-cr-229-FAB
Hon. Francisco A. Besosa, U.S. Senior District Judge

## APPELLANT'S OPENING BRIEF

TO THE HONORABLE COURT:

The defendant-appellant, Alexis D. Negrón-Cruz, represented by the Federal Public Defender for the District of Puerto Rico, through undersigned counsel, respectfully states and prays:

## JURISDICTION

Mr. Negrón appeals from the district court's November 9, 2023 judgment revoking his supervised-release term. AD1-AD6.[1] On November 13, 2023, Mr. Negrón's revocation-hearing counsel timely appealed. A250.

Jurisdiction lay in the District of Puerto Rico under 18 U.S.C. §§ 3231 and 3583. Jurisdiction lies in this Court of Appeals under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), as those statutes permit appeal from all final district-court decisions and sentences.

---

[1] Citations: Appendix ("A__"), Addendum ("AD__"), ECF entries from D.P.R. Case No. 11-cr-229-FAB ("ECF No. __"). Westlaw hyperlinks included.

# ISSUES

I. Many courts have recognized that the First Amendment protects access to the internet. The district court imposed a special condition of supervised release requiring Appellant to install third-party software on any internet-enabled device he had so probation officers could ensure he did not have illegal digital content. As enforced, probation officers can deactivate and reactivate that condition without motion to the court. They can also suspend access to the internet if Appellant cannot afford the monthly software fee for each device.

    A. Does this special condition amount to an impermissible absolute ban on internet access during any period probation activates it and Appellant is unable to afford supervision fees?

    B. Does the special condition as enforced violate Equal Protection and Due Process?

    C. Is the special condition an improper delegation of the court's Article III authority?

II. Prior to the contested final revocation hearing, the district court evaluated the revocation and punishment determination ex parte with the government's primary fact witness, the probation officer who supervised Appellant, initiated the petition to revoke supervised release, and advocated for revocation. Was this a violation of the Constitutional Due Process right to a neutral and detached arbiter?

III. While the probation officer alleged violations across multiple accusatory documents, the government elected to pursue only a subset of the officer's allegations. The district court's revocation and sentence determination, however, contained "findings" that appeared to originate in the probation officer's untested allegation narratives that the government elected not to pursue. Is reversal warranted based on the apparent reliance on unproved assertions submitted ex parte?

IV. Was it error to deny Mr. Negrón access to his latest psychological evaluation?

V. If this Court finds error under Issues I-III, should the matter be remanded to a different judicial officer?

In 2013, Alexis Negrón-Cruz suffered a first-time illicit images conviction for having images of underage sexual content between September 2010 and June 2011. ECF No. 114 at 12 (stipulated facts for plea agreement). His negotiated disposition in 2013 resulted in a 10-year prison sentence and a 25-year supervised-release term. A54-A60. He was released from prison initially on December 17, 2019, to begin supervision pursuant to the 2013 judgment. That judgment, however, is no longer in effect following a revocation hearing held February 7, 2022. A61.

At the February 7, 2022 hearing, the district court (Besosa, J.) imposed a sentence of time served for Grade C violations; the time served was approximately 18 months, 7 days. A62. The court imposed a new 300-month supervision term. A63. And the court ordered 33 special conditions that took effect when Mr. Negrón was released to the community February 8, 2022, A65-A66, under the supervision of U.S. Probation Officer Taisa Mojica, who was in turn supervised by Supervisory U.S. Probation Officer Jeffrey Semidey, *see* A74, A84, A87, A90.

Of issue on this appeal, the 2022 judgment included the following 221 words worth of special conditions limiting, restricting, and regulating Mr. Negrón's access to the internet:

20. He shall provide the Probation Officer access to any financial information upon request.

31. He shall consent to the installation of systems that will enable the Probation Officer or his or her designee to monitor and filter any internet accessing and data storage device, owned or controlled by Mr. Negrón. Mr. Negrón shall consent to, and cooperate with, unannounced examinations on any equipment owned or controlled by him, which may result in retrieval and copying of all data from the device and any internal or external peripherals and may involve removal [of] the equipment to conduc[t] a more thorough inspection. Mr. Negrón shall immediately notify the Probation Office upon registration for access to any website or service that allows for: communication with other users, uploading or downloading of files, posting of any material, etc. Notification shall include the site address, username, password, pseudonyms, and logons. This includes, but is not limited to, social networks, cloud storage services, message boards, etc. Mr. Negrón shall contribute to the cost of the monitoring service based on his ability to pay.

32. He shall not possess or use a computer, cellular telephone, or any other device with internet accessing capability, at any time or place other than those with systems that will enable the Probation Officer or his or her designee to monitor and filter any internet accessing.

A66.

If Mr. Negrón owns any "internet-capable device," probation separately imposes a three-page, 50-clause "Computer & Internet Management Program Acceptable Use Contract." A68-A72. Probation's extra-judgment directives limit a person to a single internet-capable device: "You shall not use any other Internet-capable device than the one you have been authorized to use." A68.

From February through September 2022, Officer Mojica and Supervising Officer Semidey interpreted Mr. Negrón's conditions as allowing Probation to permit Mr. Negrón to have an unmonitored smartphone if he could not afford monitoring fees. *See* A74. But around September 2022, Mr. Negrón was given an ultimatum: he either needed to start paying the cost of the monitoring service or abandon his smartphone and replace it with a phone with no internet access. A82-A83.

The record does not reveal how Mr. Negrón's "ability to pay" would be determined by probation, and the record does not show whether probation would need to identify the market rate of internet monitoring services. But, at the time, the fee was "$35, $40 monthly." A163.

Presently, probation uses a third-party monitoring company, paycomputermonitoring.com, to have people on supervision set up monitoring on their internet-capable phone or computer. "The base price for monitoring ranges from $35 to $43.26 per month per monitored device. If a supervision agency elects to use additional tools and features[,] a higher monthly cost may be reflected." https://www.paycomputermonitoring.com/payment.php (accessed Aug. 31, 2024).

According to U.S. Probation, in addition to the monthly fee, an activation fee of $43.26 applies. And the monitoring company accepts only five types of Android devices and two Windows operating systems, Windows 10 and Windows 11. Email

from U.S. Probation (sent to counsel for both Mr. Negrón and the government July 22, 2024).

Mr. Negrón was subject to revocation proceedings starting on February 10, 2023, when Officer Mojica submitted an unsworn factual narrative, alleging he violated Standard Conditions 4, 6, and 13, and Special Conditions 20 and 31. A74-A86.

This included, inter alia, an allegation that Mr. Negrón failed to comply with a directive issued in September 2022, when Officer Mojica stated that Mr. Negrón either needed to start paying the smartphone monitoring fee or get a phone "with no internet connecting capabilities." A82-A83. "Mr. Negrón related that he continues to be not financially able to comply with the monitoring condition." A82.

Officer Mojica then seized Mr. Negrón's smartphone when he could not start paying the fee and "instructed [him] to secure a basic phone with no internet connecting capabilities until … he is unable to pay for the monitoring software." A84.

On January 19, 2023, Officer Mojica met with Mr. Negrón and observed he had a tablet and another smartphone with him. A84. Three weeks later, Officer Mojica and Supervising Officer Semidey confronted Mr. Negrón for "a home inspection and [to] retrieve both devices." A84. Mr. Negrón stated he'd be returning the tablet directly to its owner, his former employer, and he gave Officer Mojica the

new phone. A84-A85. Officer Mojica stated that Mr. Negrón stalled several minutes, deleting his contacts before "hand[ing] back the phone" to Officer Mojica.

Based on Officer Mojica's narrative, the district court authorized Mr. Negrón's arrest on February 10, 2023. At his March 6, 2023 preliminary hearing, the government called Officer Mojica, and the magistrate found probable cause of a violation based on Officer Mojica's testimony. A144-A194.

As stated at the hearing, Officer Mojica had felt that "Mr. Negrón always had like a challenging attitude toward th[e] officer…." A151. Instead of sending his pay stubs directly to probation, Mr. Negrón "always referred [Officer Mojica] to Mr. William [his employer]…." A156. Yet Mr. Negrón did provide this requested documentation on November 21, 2022. A156-A157.

Officer Mojica acknowledged that probation had allowed Mr. Negrón to have a smartphone without monitoring installed while he looked for employment. A157. Officer Mojica's discretion had been exercised this way "after some discussion with [the] officer's supervisor," in which "it was agreed that [probation] would let him have the telephone until  he could secure employment to cover the monitoring cost." A157.

Officer Mojica stated that a third-party monitoring company established surveillance rates of "$35, $40 monthly." A163. Under probation's reading of Special

Condition 31, if Mr. Negrón could not afford the monitoring fee, Officer Mojica "wouldn't … allow[] [Mr. Negrón] to have a cell phone with internet connecting capabilities." A163.

Defense counsel asked why probation did not cover the cost for him when Mr. Negrón "wasn't able to pay that amount for the use of a … smart phone[,] which everyone uses in this day and age." A163-A164.

Officer Mojica replied as follows: "I don't have the answer to that question." A164. Officer Mojica acknowledged that Mr. Negrón was "unemployed for a period of time" and acknowledged receiving a letter with Mr. Negrón's financial information. A165. Officer Mojica insisted, however, that Mr. Negrón was "supposed to pay it." A164.

Counsel asked Officer Mojica if Special Condition 31 required that the "payment of" the monitoring fee "be proportional with Mr. Negrón's ability to pay for that software." A164. Officer Mojica stated: "He should contribute, I believe it says." A164. Then the following exchange occurred:

**Defense Counsel:** Exactly and so if he's not able to contribute, it was your position as Probation, as a Probation Officer, that he just simply wasn't allowed to have a smart phone.

**Officer Mojica:** Yes.

A164.

Officer Mojica then admitted that probation was not using a "set scale to de-termine how much he would be able to pay." A164. But Officer Mojica argued that probation had never "determine[d] if he was able to pay" based on "any financial statements or anything." A164. "He did not provide a consistent manner," said Officer Mojica, "pay stubs or earnings statements. So we didn't know how much he was making." A164.

Officer Mojica accepted, though, that Mr. Negrón was "unemployed for a period of time" and gave Officer Mojica precise, qualifying financial information on November 21, 2022. A165.

When probation eventually seized and inspected Mr. Negrón's phone, no-thing illegal was found on it. A168.

After the government rested, counsel for Mr. Negrón argued in part that he had not violated Special Condition 31 by failing to pay the monitoring fee because he had provided his relevant financial information and should not have been obligated to pay a fee he could not afford in order to access the internet through a smartphone. *See* A171-A173.

The magistrate found probable cause of violations of standard conditions 4, 6, 7, and 13. A180. (These violations are not challenged on this appeal, which focuses

on the internet-access restrictions.) The magistrate found no probable cause as to Special Condition 20, and found probable cause of a violation of Special Condition 31. A180. The magistrate released Mr. Negrón on conditions of home detention with GPS monitoring. A35 (*see* ECF No. 344).

After his release, Officer Mojica filed two follow-up motions alleging violations. First, after the March 6, 2023 preliminary hearing, Mr. Negrón still had an internet-capable smartphone, which probation officers messaged using WhatsApp. A87. As soon as the message was "delivered and read," Officer Mojica alleged, Mr. Negrón called her to say he didn't notice his phone plan still included internet access but that he was willing to cover monitoring costs. A88. Probation told Mr. Negrón, though, that "those were not the instructions given to him." A88. Mr. Negrón was then told to bring probation his phone and sim card for forensic examination. A88. He complied. A88.

On March 10, four days after the preliminary hearing, Officer Mojica filed a motion purporting to allege "additional violations" based on an assertion that Officer Mojica learned on March 9 that Mr. Negrón "is or has been employed by Uber." A91. The officer understood that Mr. Negrón had violated standard condition 7, which required 10 days' notice before he changed where he worked or changed anything about his work. A91. In the same March 10 motion, Officer Mojica

asserted that she'd just learned that "phones with no capacity of internet connection have become scarce…." A90. So, in order to communicate with Mr. Negrón, Officer Mojica now stated she did "not oppose Mr. Negrón-Cruz securing a basic phone commonly known as a 'flip phone.'" A90. Provided Mr. Negrón could find and purchase, a "flip phone," the instruction was for him to "hand" it over to Officer Mojica "once [a] monitoring system was installed on March 27, 2023." A90.

Officer Mojica disavowed "precluding him from accessing the internet," asserting probation's "role is to enforce" Special Condition 31. A90-A91.

Three weeks later, on March 27, 2023, Officer Mojica filed a two-paragraph motion requesting a warrant for Mr. Negrón's arrest. A93. Officer Mojica alleged Mr. Negrón had continued working for Uber Eats, had started a food delivery business called Entreguitas.com, and had admitted having "a back-up cellphone," which he had because "he cannot wait until the officer decides to install the required monitoring software." A93. A probation officer had searched Mr. Negrón and seized "a black smartphone." A93.

The district court issued an arrest warrant, and ordered Mr. Negrón detained at a March 30, 2023 initial hearing pending a preliminary hearing on Officer Mojica's supplemental motions. A37-A38 (*See* ECF Nos. 364, 368).

At the preliminary hearing, the government called Officer Mojica and Supervisory U.S. Probation Officer Guillermo Montañez to testify. *See* A206-A238. Officer Mojica testified about Mr. Negrón being told he needed to get a phone with no internet capability only to learn that those generally no longer exist. A210-A216. Officer Mojica also testified to obtaining Mr. Negrón's smartphone on March 7 to install monitoring software. A207.

Supervisory Officer Montañez testified to retrieving the backup phone Mr. Negrón was using in the three-week period when Mr. Negrón was waiting to have monitoring software installed. A223, A229-A230. Supervisory Officer Montañez also explained that, once monitoring software was installed, Mr. Negrón would need to sign a 50-clause contract to participate in the "computer and internet management program." A232. Supervising Officer Montañez claimed the three-week delay to install software was so someone could do a forensic examination on the phone and wait for a software-installation appointment. A226-A227.

Supervisory Officer Montañez acknowledged that he'd learned Mr. Negrón had gotten the backup phone so he could work making food deliveries while probation installed monitoring software on the seized phone. But Supervisory Officer Montañez opined that work is "the concern of every living, working person in the planet. Everybody needs to work but that's not the point. The point [is] that he was

using a smartphone that he had not reported to our office in violation of his conditions." A230.

Counsel for Mr. Negrón argued against finding probable cause regarding Officer Mojica's supplemental allegations. A240-A243. Counsel's arguments focused on the need to work to cover Mr. Negrón's basic necessities, as he has "the right to live, he has the right to work and under the conditions of supervised release he has the right to a cell phone with monitoring software installed." A243. Counsel noted that probation gave no "explanation for why there was a twenty day delay in the installation of the software. … [T]he process takes only one hour." A244. During that three-week period, the defense was "never told that the delay is because [probation officers] need to do some sort of extraction or analysis of the phone. Another phone would have been brought." A244. Supervisory Officer Montañez resisted questions seeking details on the nature of the 20-day delay to account for an inspection of the phone, saying "I am actually the supervisor [of phone inspectors] and I know they take time. You're asking if I know it explicitly takes so many days. It takes whatever time it takes." A228.

The magistrate found probable cause. A244. Mr. Negrón sought continued conditions of release, noting that a phone with software was ready and Mr. Negrón was at risk of losing his rental apartment. *See* A245-A246.

Supervising Officer Semidey—who had supervised Officer Mojica's supervision of Mr. Negrón—stood up and argued against granting bail for Mr. Negrón. A246. Mr. Negrón was remanded to custody pending a final hearing, which took place five months later on November 9, 2023.

Prior to the hearing, Mr. Negrón moved for disclosure of his latest psychological examination report, based on an assessment done by a clinician employed by the government. A109-A110. Officer Mojica, who had possession of the evaluation, alleged it was not a document expressly listed in the D.P.R. Local Rules, so she had refused to disclose it. A111-A112. Rather than order disclosure to Mr. Negrón, the judge ordered Officer Mojica to submit Mr. Negrón's "latest psychological/psychiatric report" ex parte; Officer Mojica complied. A43 (*see* ECF Nos. 421, 426).

A final revocation hearing was held on November 9, 2023. A113. At the time, Mr. Negrón had been imprisoned for about eight months, six days (February 10 to March 6; March 30 to November 9). Before the government called its first witness, the district court called counsel to sidebar, discussing and introducing its tentative adjudication as follows:

> **The Court:** I have been speaking with [Officer] Mojica about what to do today with Mr. Negrón, and we both agreed that the best thing to do would be to give him time served.

Is that okay with you, [Defense Counsel]?

A114.

Counsel advised the court that Mr. Negrón would likely want to appeal the revocation itself and will have "objections to the conditions that" counsel "imag[ined] the Court will impose as terms of supervised release." A115.

Officer Mojica then joined the judge, defense counsel, and government counsel to discuss the conditions the court would be imposing:

**The Court:** These supervised release [conditions] that you list here, are they the same that were imposed before?

**The Probation Officer:** I just eliminated the drug conditions since he doesn't have a history, and they are all the same.

A115.[2]

Next, a revocation hearing was held. While Officer Mojica was available and had just spoken on the record, the court allowed the government to pursue revocation based on hearsay statements Officer Mojica made at the preliminary hearing.

---

[2] Prior to final supervised-release hearings, and prior to any finding of violation, District of Puerto Rico probation officers prepare "wording" for some revocation judges. *See United States v. Reyes-Correa*, 81 F.4th 1, 9 (1st Cir. 2023) (discussing "wording" without deciding whether probation submitting anything other than a sentence recommendation violated due process and Rule 32.1, as the violation there was not contested and the claimed error was harmless).

The defense objected under "Rule 32, due process and *Morrissey* grounds, as well as confrontation grounds." A116-A117; *see also Morrissey v. Brewer*, 408 U.S. 471 (1972).

The government argued against reading *Morrissey* and Rule 32.1 literally when a preliminary hearing had been held, saying that holding the required hearing would give the defense "a second bite at the apple, so[] to speak," and would "not be necessary." A117. The judge agreed with the government, taking judicial notice of the preliminary hearing transcript from the first preliminary hearing. A117-A118. The judge stated: "I have read the transcript in its entirety. It is the transcript of the Preliminary Revocation Hearing held before" the magistrate "on March 6, 2023, and it's been filed at Docket No. 375." A118.[3]

Counsel for the government and Mr. Negrón's counsel then argued to the court regarding whether any violations could be sustained based on the March 6 hearing transcript. *See* A118-A124. Most pertinently to the Special Condition 31 allegation, the defense argued the record showed probation had unilaterally modified and changed that condition and allowed Mr. Negrón to have an unmonitored cellular

---

[3] A typographical error in the Contents page of the Appendix lists the Second Preliminary Hearing Transcript, as "evidence" accepted at the final hearing. That transcript, created January 4, 2024, had not been created at the time of the November 9, 2023 hearing. *See* A196-A249. Nor does the record show it was ever proffered by the government or relied on by the court.

telephone for a period of about eight months but, apparently, in Probation's view, with the ability to seize that [device] without any sort of additional justification, and seize it for significant periods of time as they deemed appropriate. A121.

The defense continued, arguing "that was an illegal modification of the conditions of … supervised release imposed" by the court. A121. "[I]t caused great problems during Mr. Negrón's supervised release term," and it "also led to his inability to work at times because of the seizure of these devices." A121. Counsel concluded that "there should be no revocation in this case because all the violations essentially stem from this illegal modification of the condition that the Court imposed regarding his possession, the use of electronic devices." A122.

The prosecution argued there was a preponderance of evidence for each charge the magistrate found probable cause on, standard conditions 4, 6, 7, and 13, and Special Condition 31. A122. Mr. Negrón then allocuted. A125-A132.

The court sustained violations of standard conditions 4, 6, 7, and 13 and Special Conditions 31 and 32. A133. It stated it considered, inter alia, "the motions filed by the probation officer"—even though the government's evidence was limited to the officer's adverse hearsay testimony from the March 6 preliminary hearing. A133. The court then read off factual statements regarding allegations presented by Officer Mojica in her motion presented before the March 6 hearing. A134:5-17.

The court continued, stating narratives not testified to and not presented in any of probation's motions. First, the court stated Mr. Negrón lied to Officer Mojica on January 19, 2023, about working for Uber Eats, when he "had already had an active delivery account with Uber since January 4, 2023." A134. A similar allegation appeared in Officer Mojica's March 10, 2023 motion, but that motion alleged Mr. Negrón "is or has been employed by Uber" as of March 10, according to information Officer Mojica obtained March 9, 2023. A91

The court then related further disputed narratives, relying on Officer Mojica's accounts, A134-A135, and arriving at the narrative of Mr. Negrón's March 27, 2023 report to probation. No evidence regarding March 27, 2023, had been presented at the final hearing.[4] The district court, nonetheless, read nearly verbatim from Officer Mojica's narrative at ECF No. 362. *Compare* A135 (sentencing wording) *with* A93 (narrative describing March 27, 2023 report to probation, a search by probation officers, and Mr. Negrón's surrender of a "back-up phone").

The court continued, stating Mr. Negrón admitted on November 21, 2022, to providing delayed notification to Officer Mojica when his employment changed.

---

[4] While a preliminary hearing had been held on the Officer Mojica's post-March 6 motions, *see* A196-A249, the government did not attempt to rely on it, and the court did not assert having received a record of it.

A136. Officer Mojica, who was not speaking under oath, interrupted the court's pronouncement to state she conducted the "administrative hearing" on November 15. A136-A137. Her motion had alleged the "administrative hearing" was on November 21. A83.

The court then read an account of another "administrative hearing" on February 11, 2023, in which Mr. Negrón admitted having a cellphone with internet-connection capability and probation allowed him to keep using it "until he could secure employment to cover the monitoring cost." A137. The court added that Mr. Negrón declined to provide passwords officers requested. A137. And the court stated that Mr. Negrón "never provided the probation officer any financial information that would allow the probation officer to determine whether or not he was able to pay for the monitoring cost." A137.

The court sentenced Mr. Negrón to "time served," about 8 months, 6 days, A138, and it imposed a new sentence of 270 months' supervised release. A138. It imposed conditions provided to the court by Officer Mojica, except for a urine-monitoring condition, which was removed. A138.

The defense objected to revocation based on the arguments presented at the final hearing and those in a defense-filed revocation memorandum. *See* A95-A107. The district court, counsel argued, erred in relying on material that had not been

submitted in the government's case, *i.e.*, "information that was outside the confines of the preliminary hearing that was held in this case." A139. And the defense opposed reimposition of the special conditions from the 2022 judgment; namely, conditions 11, 23, 31, and 32, which the defense objected to. A139. These conditions "are not sufficiently related to the goals of supervised release, and even if sufficiently related, involve a greater deprivation of liberty than reasonably necessary to achieve the goals of supervision. They are also … vague and contain elements of an improper and arbitrary delegation of authority to Probation." A139.

When the district court defended reimposition of Special Condition 31, counsel objected, stating it should be "imposed on a reasonable sliding scale." A140. Mr. Negrón timely appealed. A250.

## INTRODUCTION & SUMMARY OF THE ARGUMENTS

The internet is a global system of interconnected computer networks that uses the Internet protocol suite to communicate between networks and devices. It is a network of networks, consisting of private, public, academic, business, and government networks of local to global scope, linked by a broad array of electronic, wireless, and optical networking technologies. In modern society, the internet is the lifeblood of human life, playing a role in our lives twenty-four/seven. As of 2022, it was estimated that 5.4 billion people use the internet, more than two-thirds of the world's population. *See* Wikipedia, *Internet* (visited Sept. 2, 2024). Today's internet connectivity provides what we understand as a digital world that is intertwined with the physical world we inhabit.

The appellant, Alexis Negrón-Cruz, is subject to a labyrinth of special supervised-release conditions that have banished him for days and weeks from the digital world, a world which we all have a constitutional right, and even a human right, to access. This was because the conditions conditioned his access to the internet upon his paying a private company to monitor each and every device he used. To sign up for such monitoring he also had to sign a separate contract with probation that limited his access according to 50 additional directives.

This brief argues that, as enforced, the special conditions condition amount to an impermissible absolute ban on internet access during any period probation activates the conditions and either delays monitoring software installation or requires Appellant to pay fees he cannot afford. Similarly, because the conditions leave extraordinary discretion to probation officers in the activation and deactivation of the conditions, they improperly delegate the court's authority under Article III of the Constitution. And because the special conditions make internet access dependent on financial ability, as enforced they violate Equal Protection and Due Process.

Aside from the special conditions themselves, this brief addresses issues that arose when the district court made revocation and punishment determinations ex parte with the government's primary fact witness, the probation officer who had supervised Appellant and initiated revocation proceedings. It is argued the court's adjudicative activities with the officer violated the constitutional due process right to a neutral and detached arbiter.

Similarly, where the district court made "findings" that appeared to originate in the probation officer's untested allegation narratives, which the government did not pursue, we argue reversal is warranted due to the apparent reliance on unproved assertions submitted ex parte.

Penultimately, issue four posits that the court erred in denying Mr. Negrón access to his latest psychological evaluation, carried out at probation's behest after his February 2022 release. Finally, if error is found under Issues I-III, the last issue submits that the matter be remanded to a different judicial officer.

## MAIN STANDARDS OF REVIEW

### *Constitutional Due Process Violation Standard*

Preserved constitutional errors shoulder the government with "the burden of proving beyond a reasonable doubt that the error did not affect the defendant's substantial rights." *United States* v. *Vázquez-Rivera*, 407 F.3d 476, 489 (1st Cir. 2005).

### *Procedural and Substantive Review of Special Conditions Standard*

This Court reviews imposition of special conditions of supervised release for abuse of discretion. *United States v. Sepúlveda-Contreras*, 466 F.3d 166, 172 (1st Cir. 2006).

### *Reliance on Material Provided Ex Parte by Probation Officers*

Reversal is warranted when a sentencing court materially relies on ex parte probation officer submissions that have not been subject to adversarial testing. *United States v. Ramos-Carreras*, 59 F.4th 1, 5 (1st Cir. 2023).

**I.** **THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT REIMPOSED INTERNET-ACCESS RESTRICTIONS THAT PERIODICALLY IMPOSE AN IMPERMISSIBLE, ABSOLUTE INTERNET BAN AND PERMIT AN IMPROPER DELEGATION OF AUTHORITY TO PROBATION OFFICERS.**

**A.** **Introduction**

> Our concerns about [an] unqualified prohibition of home internet use are even more salient because the conditions … will only take effect … after the completion of [the] prison sentence. The importance of the internet in modern life has steadily increased over time, and we have no reason to believe that this trend will end.

*United States v. Perazza-Mercado*, 553 F.3d 65, 73 (1st Cir. 2009).

> A lengthy report …released by the United Nations … argued that disconnecting individuals from the Internet is a violation of human rights and goes against international law.

Jackson, *U.N. Declares Internet Access a Basic Human Right*, THE ATLANTIC, June 3, 2011.

> Where sex offenders on supervised release already face an uphill battle in rejoining the community socially and economically, completely restricting access to the internet severely infringes their interest in a variety of recognized private liberties 12 and constitutional rights.

Tatelman, *Note: Give Me Internet or Give Me Death: Analyzing the Constitutionality of Internet Restrictions as a Condition of Supervised Release for Child Pornography Offenders.*, 20 CARDOZO J.L. & GENDER 431, 433 (2014).

The special conditions imposed in 2022—though dense and burdensome—

appeared to provide an adequate path to access the internet access when imposed

two and a half years ago: when Mr. Negrón had internet-enabled devices, he was

required to have them monitored and filtered for illegal content. *See* A66. Whatever

the market cost, he had to "contribute to the cost of the monitoring service based on his ability to pay." A66. Like with electronic GPS monitoring, he would have expected to contribute according to the market rate and financial ability.

Without a publicly filed motion to the court, and without any scale to determine Mr. Negrón's ability to pay, probation unilaterally left this condition unenforced for most of 2022. During that time, probation officers inspected devices Mr. Negrón used and exchanged hundreds of messages with him over internet-based messaging applications. But then Probation Officer Mojica unilaterally invoked Special Condition 31, telling Mr. Negrón—who had just started working—that he'd be blocked from using a smartphone until he could pay "$35, $40 monthly." A163. Probation made clear it was enforcing the pay-for-access condition without any reasoned, standardized consideration of Mr. Negrón's ability to pay. Without that consideration, it was an absolute ban on access to the internet. Even a temporary ban on the internet must be scrutinized closely if it is to comport with applicable statutory sentencing law, the First Amendment, and Equal Protection.

And the arbitrary deactivation and activation of Special Condition 31 constitutes an improper delegation of the district court's Article III authority.

## B. Legal Framework

Under 18 U.S.C. § 3583(d), the imposition of certain conditions of supervised release is mandatory, but district courts also have discretion to impose other, non-mandatory conditions of supervised release, which are commonly referred to as "special conditions." That discretion is circumscribed by 18 U.S.C. § 3583(d)(1) and U.S.S.G. § 5D1.3(b), which each require that the special conditions be "reasonably related" to familiar sentencing factors such as the nature of the offense, the history and characteristics of the defendant, broader deterrence and public protection interests, and various needs of the defendant. Additionally, both provisions admonish sentencing courts that special conditions should involve "no greater deprivation of liberty than is reasonably necessary" to achieve those purposes, and should be "consistent with any pertinent policy statements issued by the Sentencing Commission." 18 U.S.C. § 3583(d)(2)-(3); U.S.S.G. § 5D1.3(b); *see also United States v. Johnson*, 529 U.S. 53, 59 (2000) ("Supervised release fulfills rehabilitative ends, distinct from those served by incarceration.").

Where a supervised-release condition implicates a constitutional right—*e.g.*, a convicted person's First Amendment right to access the internet—courts "conduct a more searching review," *United States v. Eaglin*, 913 F.3d 88, 95 (2d Cir.

2019), and require that the special condition be "supported by particularized findings that it does not constitute a greater deprivation of liberty than reasonably necessary to accomplish the goals of sentencing," *United States v. Matta*, 777 F.3d 116, 123 (2d Cir. 2015) (internal quotation marks omitted).

Courts should "carefully scrutinize unusual and severe conditions." *United States v. McLaurin*, 731 F.3d 258, 261 (2d Cir. 2013) (internal quotation marks omitted). For total internet bans, "only highly unusual circumstances will" justify them "as a condition of supervised release." *Eaglin*, 913 F.3d at 97; *see also United States v. Sofsky*, 287 F.3d 122, 126 (2d Cir. 2002) (vacating a special condition prohibiting a supervised person from using the internet because it "inflict[ed] a greater deprivation on [their] liberty than [was] reasonably necessary"). Many circuits have refused to uphold total bans on internet access even in cases involving the receipt of child pornography. *See, e.g.*, *United States v. Crume*, 422 F.3d 728, 733 (8th Cir. 2005); *United States v. Holm*, 326 F.3d 872, 877-78 (7th Cir. 2003); *United States v. Freeman*, 316 F.3d 386, 391-92 (3d Cir. 2003); *Sofsky*, 287 F.3d at 126-27; *United States v. White*, 244 F.3d 1199, 1206-07 (10th Cir. 2001).

And the Fifth Circuit has added meaningful nuance to interpreting the breadth of narrowness of internet-restricting conditions, establishing that restrictions on the use of computers or the internet must be "narrowly tailored either by scope or by

duration" as to not preclude a defendant "from meaningfully participating in mo-

dern society." *United States v. Duke*, 788 F.3d 392, 400 (5th Cir. 2015). Even in cases

where restrictions have been narrowed by permitting access when a person obtains a

probation officer's prior approval, such approval must still be applied "in such a way

as to give defendants meaningful access to computers or the Internet." *United States*

*v. Becerra*, 835 F. App'x 751, 756 (5th Cir. 2021) (citation omitted); *see also United*

*States v. Clark*, 784 F. App'x 190, 193-94 (5th Cir. 2019) (finding unreasonable a

condition requiring the defendant to request approval every time he sought to use a

computer or access the internet).

The Fifth Circuit's jurisprudence harmonizes with the Supreme Court's First

Amendment jurisprudence: "the loss of First Amendment freedoms, for even min-

imal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*,

427 U.S. 347, 373 (1976) (citation omitted).

Sentencing conditions that prevent an indigent person from accessing services

available to well-resourced people implicate Equal Protection. The Fifth Amend-

ment provides that "[n]o person shall be … deprived of life, liberty, or property,

without due process of law." U.S. Const. amend. V. Although the Fifth Amendment

does not contain an equal protection clause, the Supreme Court construes the Fifth

Amendment to contain an equal protection guarantee. *See Bolling v. Sharpe*, 347 U.S.

497, 498-99 (1954). Consistent with equal protection, a sentencing court may not revoke a person's community-supervision term for failure to pay restitution unless the failure was "willful" or the person "failed to make sufficient bona fide efforts." *Bearden v. Georgia*, 461 U.S. 660, 668-69, 672 (1983).

## C. Special Condition 31—as applied—is insufficiently tailored and improperly imposes an absolute internet ban.

As applied here, the present complex of conditions imposed a virtually total ban on internet access at any time. And they functionally restrict Appellant to only one device at a time unless his devices are compatible with the for-profit device-surveillance company and he can afford the fees for each device and wait for installation.

### 1. The internet is ubiquitous in daily life, and access to it is a First Amendment right.

Even setting aside the proliferation of the "Internet of Things," which has exploded the category of devices that could qualify as internet-connected, *see* Hoofnagle, et al., *The Tethered Economy*, 87 GEO. WASH. L. REV. 783, 785 (2019), computers and cell phones and the services they provide are now "'such a pervasive and insistent part of daily life' that carrying one is indispensable to participation in modern society." *Carpenter v. United States*, 585 U.S. 296, 315 (2018) (quoting *Riley v. California*, 573 U.S. 373, 385 (2014)); *see United States v. Peterson*, 248 F.3d 79, 83 (2d Cir. 2001) (same for computers).

### 2. Special Condition 31's impairment of the right to internet access is not narrowly tailored and is insufficiently limited in temporal scope.

Here, Officer Mojica testified that, if Mr. Negrón could not pay the $35 fee, he "wouldn't be allowed to have a cell phone with internet connecting capabilities." A163. It follows, he would not be allowed to have any other internet-connected device.

Probation's interventions in September 2022 exposed an absence of a reasoned mechanism for an indigent supervisee to retain internet access under Special Condition 31. On September 28, 2022, Mr. Negrón maintained he could not financially comply with the conditions. But no alternative was provided: without direct payment to a third party, Officer Mojica "wouldn't ... allow[] [Mr. Negrón] to have a cell phone with internet connecting capabilities." A163. Period.

The district court's special conditions, as applied here, should not have charged Mr. Negrón with costs imposed by the for-profit monitoring company. And if it did, at a minimum, it should have applied a sliding scale and a transparent, predicable process to timely installing monitoring software or alternatively allowing minimally invasive searches of Appellant's devices while protecting his security, privacy, and dignity.

Even were fees to be waived, as enforced, Special Condition 31 stands to periodically cut off internet access for time periods so excessive they violate the First Amendment. As defense counsel's objections stated, when probation finally took action to install its surveillance software, it gave no "explanation for why there was a twenty day delay in the installation of the software. … [T]he process takes only one hour." A244. Three weeks without internet communications, without a smartphone, in 2022 and 2023, was excessive and unjustified. *See Elrod*, 427 U.S. at 373 (citation omitted). Special Condition 31 ultimately precludes Mr. Negrón "from meaningfully participating in modern society." *Duke*, 788 F.3d at 400. And it's insufficiently limited in scope and duration. It must be stricken.

### D. The re-imposition of Special Condition 31, as enforced, violates Equal Protection.

Special Condition 31 leaves in place a process to deprive Mr. Negrón of his First and Fifth Amendment rights based on his non-willful inability to pay the third-party internet-access fee arranged by probation. *See Bearden*, 461 U.S. at 668-69, 672; *Williams v. Illinois*, 399 U.S. 235, 240-41 (1970) (vacating judgment because when imprisonment exceeds maximum period fixed by statute and "results directly from an involuntary nonpayment of a fine or court costs we are confronted with an impermissible discrimination that rests on ability to pay"); *Tate v. Short*, 401 U.S. 395,

398 (1971) ("[T]he Constitution prohibits the State from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full." (internal quotation marks omitted)).

The central mandate of the equal protection guarantee is that "[t]he sovereign may not draw distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objective." *Lehr v. Roberson*, 463 U.S. 248, 265 (1983). Along with equal protection, due process prohibits "invidious discrimination between persons and different groups of persons." *Griffin v. Illinois*, 351 U.S. 12, 17 (1956); *see id.* at 20 (holding that failure to provide indigent defendants with trial transcripts at no cost violated equal protection and due process). In short, "[b]oth equal protection and due process emphasize the central aim of our entire judicial system—all people charged with crime must, so far as the law is concerned, stand on an equality before the bar of justice in every American court." *Id.* at 17 (citation, internal quotation marks omitted).

When the district court adopted the March 6 preliminary hearing transcript as the basis for its revocation determination, it adopted Officer Mojica's view that Mr. Negrón had to simply remain without internet access until he could pay the corporation that probation had tasked with monitoring his cellphone. Nor did anything

in the record remotely support a finding that Mr. Negrón had materially withheld information needed to calculate his ability to pay. He provided his financial information to Officer Mojica in November 2022, and probation knew he was unemployed for an extended period of time that year. A163-A164. Had probation ever been lacking information regarding Mr. Negrón's indigency, the fact remains that probation was not using a "set scale to determine how much he would be able to pay." A164. Hence, Officer Mojica admitted it was probation's position that, if Mr. Negrón "not able to contribute" to monitoring costs, "he just simply wasn't allowed to have a smart phone." A164. And in any case, nothing akin to the *Bearden* inquiry was ever conducted.

The Special Condition, as enforced and applied, violates equal protection and due process.

### E. As enforced by probation, Special Condition 31 improperly delegates Article III authority.

Article III of the Constitution vests responsibility for resolving cases and controversies with the courts. A district court may "'us[e] nonjudicial officers to support judicial functions," but only "as long as that judicial officer retains and exercises ultimate responsibility.'" *United States v. Allen*, 312 F.3d 512, 515-16 (1st Cir. 2002) (quoting *United States v. Johnson*, 48 F.3d 806, 809 (4th Cir. 1995)). In *United States v. Merric*, 166 F.3d 406 (1st Cir. 1999), this Court vacated the defendant's sentence

because the trial court impermissibly delegated to a probation officer the power to set the defendant's fine payment schedule. *See id.* at 408-09.

In *Meléndez-Santana*, this Court upheld a delegation challenge to a special condition of supervised release because the district court had authorized the defendant's probation officer to determine not only the details of the defendant's drug treatment, *but also whether the defendant would be required to undergo such treatment. See United States v. Meléndez-Santana*, 353 F.3d 93, 101-102, 106 (1st Cir. 2003).

Here, the district court reimposed a condition that was shown to allow probation to disactivate and reactivate without reasoned regard for Mr. Negrón's ability to pay the fee associated with it. This constitutes an unreasonable delegation of authority, and the virtually unlimited discretion given to probation renders the Special Condition one that carries a "greater deprivation of liberty" in access to the internet "than is reasonably necessary for the purposes set forth" in the sentencing guidelines and policy statements. U.S.S.G. § 5D1.3(b). And prospectively, the conditions, together with probation's 50-clause "contract" of use, A232, is a far greater deprivation than necessary, which also fails "to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited," as they return to the community and have daily encounters with internet-enabled devices. *United*

*States v. Simmons*, 343 F.3d 72, 81 (2d Cir. 2003). And as seen in the record, the

present conditions invite arbitrary enforcement.

II.  **THE DISTRICT COURT MADE A SIGNIFICANT, STRUCTURAL ERROR OF LAW WHEN IT EVALUATED THE REVOCATION AND PUNISHMENT DETERMINATION EX PARTE WITH THE PRIMARY FACT-WITNESS OFFICER WHO HAD TESTIFIED FOR THE GOVERNMENT AND PETITIONED THE COURT TO REVOKE SUPERVISED RELEASE.**

A.  **Legal Framework**

Minimum due process standards for conditional-liberty revocation require

that the decision to revoke a person's liberty be made by "a neutral and detached

arbiter." *See Morrissey v. Brewer*, 408 U.S. 471, 489 (1972). As the Supreme Court

has observed more generally, a "fair trial in a fair tribunal is a basic requirement of

due process." *In re Murchison*, 349 U.S. 133, 136 (1955).

What erodes neutrality and detachment is the intertwinement of investigative

and adjudicative powers such that, "under a realistic appraisal of psychological ten-

dencies and human weakness, conferring investigative and adjudicative powers on

the same individuals poses such a risk of actual bias or prejudgment that the practice

must be forbidden if the guarantee of due process is to be adequately implemented."

*Withrow v. Larkin*, 421 U.S. 35, 47 (1975).

First enacted *after Morrissey*, 18 U.S.C. § 3583(e)(3) permits revocation of

supervised release only "if *the court*, pursuant to the Federal Rules of Criminal

Procedure applicable to revocation of probation or supervised release, finds by a

preponderance of the evidence that the defendant violated a condition of supervised release." 18 U.S.C. § 3583(e)(3). In turn, Rule 32.1 structures revocation hearings, providing the accused with the right to public hearing, incorporating minimum due process standards. *See* Fed R. Crim. P. 32.1(b)(2). And since 1979, Rule 32.1 expressly incorporates minimum due process standards:

- Notes of Advisory Committee on Rules—1979: "Since *Morrissey v. Brewer*, 408 U.S. 471 (1972), and *Gagnon v. Scarpelli*, 411 U.S. 778 (1973), it is clear that a [supervised person] can no longer be denied due process in reliance on the dictum in *Escoe v. Zerbst*, 295 U.S. 490, 492 (1935), that [community supervision] is an "act of grace."

- Notes of Advisory Committee on Rules—1993 Amendment: "Requiring production of witness statements at hearings conducted under Rule 32.1 will enhance the procedural due process which the rule now provides and which the Supreme Court required in *Morrissey v. Brewer*, 408 U.S. 471 (1972) and *Gagnon v. Scarpelli*, 411 U.S. 778 (1973)."

- Committee Notes on Rules—2002 Amendment: "Rule 32.1(b)(1)(B)(iii) and Rule 32.1(b)(2)(C) address the ability of a releasee to question adverse witnesses at the preliminary and revocation hearings. Those provisions recognize that the court should apply a balancing test at the hearing itself

when considering the releasee's asserted right to cross-examine adverse witnesses. The court is to balance the person's interest in the constitutionally guaranteed right to confrontation against the government's good cause for denying it. *See, e.g., Morrissey v. Brewer*, 408 U.S. 471, 489 (1972); *United States v. Comito*, 177 F.3d 1166 (9th Cir. 1999); *United States v. Walker*, 117 F.3d 417 (9th Cir. 1997); *United States v. Zentgraf*, 20 F.3d 906 (8th Cir. 1994). "

Unlike in revocation proceedings, original sentencing proceedings allow courts, upon case-specific reasons or local rule, to receive ex parte sentence recommendations from probation's presentence report writers *after* a person has pleaded guilty. Fed. R. Crim. P. 32(e)(3). As Rule 32(e)(3) provides, "[b]y local rule or by order in a case, the court may direct the probation officer not to disclose to anyone other than the court the officer's recommendation on the sentence." But the presentence report, or any ex parte recommendation, cannot be disclosed to an adjudicator "until the defendant has pleaded guilty or nolo contendere, or has been found guilty." Fed. R. Crim. P. 32(e)(1).

The express probation officer role in Rule 32, and the absence of any special role in Rule 32.1 must be understood as intentional under the *expressio unius* canon, which states that "the expression of one thing is the exclusion of other things."

*United States v. Reccko*, 151 F.3d 29, 34 (1st Cir. 1998). With Rule 32.1's incorporation of *Morrissey* and *Gagnon*, that rule elects not to distinguish between witnesses, whether they be impartial, civilian fact witnesses or fact witnesses who seek arrest, warrants, and revocation on behalf of U.S. Probation. The drafters of Rule 32.1 and lawmakers passing 18 U.S.C. § 3583(e)(3) were aware that federal revocation cases would be prosecuted by U.S. Attorneys with the use of probation officers as fact witnesses in a distinct role from the Rule 32 process; and they knew from *Morrissey*, *Gagnon*, and *Withrow v. Larkin*, that investigative and adjudicative functions needed to be separate to ensure fairness and due process. *See Parker Drilling Mgmt. Servs., v. Newton*, 587 U.S. 601, 611 (2019) ("Congress legislates against the backdrop of existing law.") (citation, internal quotation marks omitted).

To be sure, this Court has addressed limited, non-structural claims regarding ex parte pre-revocation sentencing contact with fact-witness officers. *See United States v. Reyes-Correa*, 81 F.4th 1, 6 (1st Cir. 2023). But, as addressed in the next section, the error here is of structural dimension. The judgment of conviction does not authorize revocation by an arbiter who is not neutral and detached. As one state tribunal explained the *Morrissey/Gagnon* right, "[i]t is fundamental to the concept of a fair hearing that a judge not receive information relevant to the disposition of a case outside the adjudicatory process and outside the presence of one or both parties."

*State v. Stewart*, No. W2009-00980-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS

691, at *21 (Crim. App. Aug. 18, 2010).

> **B.    The court's ex parte adjudication alongside a fact-witness probation officer was structural error undermining the Fifth Amendment right to a neutral and detached arbiter at a public hearing.**

Here, the district court presented itself as a single adjudicative unit, with the

probation officer serving as the government's primary fact witness and the primary

investigative officer who presented the alleged violations that Appellant contested.

So two categories of underlying facts render the right to a neutral and detached

arbiter violated. First, the district court involved Officer Mojica in the most critical

aspects of adjudication, starting with finding violations, and finishing with the fash-

ioning of punishment. Second, the probation officer's investigative actions, factual

disputes, interpretive challenges, prior adjudicative responsibility, and primary fact-

witness role created an unacceptable probability of bias that undermined minimum

due process.

> **1.    The fact-witness, quasi-prosecutorial probation officer crossed the investigator-adjudicator divide.**

Here, the hearing was contested, and the government had twice called Officer

Mojica its core fact-witness against Mr. Negrón. A144-A194; A206-A238. The gov-

ernment had represented that it sought revocation based solely on allegations Officer

Mojica made at the March 6 preliminary hearing, and offered the hearing transcript

as its only evidence at the final hearing. A117. The district court stated that it'd be relying on the March 6 transcript at ECF No. 375. But, while Officer Mojica's factual narratives and proposed conclusions were pending adjudication, the district court convened Officer Mojica to "speak[] with [her] about what to do today with Mr. Negrón." A114. In the court's consultation with Officer Mojica, the court and Officer Mojica "both agreed that the best thing to do would be to give him time served." A114. What "time served" meant here was sustaining each of the violations allegations presented by Officer Mojica at A74-A94, even those not pursued by the government at the final revocation hearing. And upon sustaining violation, under the applicable sentencing framework, the court and Officer Mojica "both agreed" a particular sentence of eight plus months' time served was warranted. The court-probation-officer agreement included Officer Mojica's dictation of virtually the same set of special conditions for a new supervised-release term of 270 months, which is shown by the judge's consultation with Officer Mojica to confirm as follows: "These supervised release terms that you list here, are they the same that were imposed before?" A115. The answer was "yes," minus a "drug condition" that Officer Mojica had "just eliminated." A115.

## 2. The fact-witness, quasi-prosecutorial probation officer was so involved in the investigative, percipient witness role that co-adjudication with the court created a heightened probability of bias or the appearance of bias.

The record reflects at least five issues rendering the probation officer an improper participant in the co-adjudication of violation and the fashioning of punishment.

*First,* probation officer fact witnesses were heavily invested in specific factual observations presented to the court in unsworn motions and sworn testimony. Probation officers had authored almost two dozen pages of allegations and factual narrative, A74-A94, and had testified against Mr. Negrón in the government's case at two separate hearings, A144-A249. According to Officer Mojica, nearly everything the officer knew about relevant factual events was based on the officer's first-hand visual or aural observations.

Adjudicators of violations should not play dual roles in a revocation process. The state case discussed above provided the following example: "All of the particular information a judge might learn by actually witnessing a bank robbery, for example, might be admissible as evidence and properly placed before him in a later criminal trial, but the Due Process Clause doubtlessly prevents any defendant's case from being reviewed by a judge with such first-hand knowledge of the crime. For due

process purposes, the Constitution is concerned not just with what a judge knows, but how the judge knows it." *Stewart*, 2010 Tenn. Crim. App. LEXIS 691, at *31.

**Second,** U.S. Probation, the Judicial Conference, and this Court contemplate the fact-witness role as requiring guarantees regarding their recollections for factual allegations used to secure liberty deprivations. In 2011, this Court noted that "the form currently used by probation officers in petitioning for a warrant to arrest a supervised releasee, although not used in this case, is called a 'Petition for Warrant or Summons for Offender Under Supervision.' The form has a space for the … officer to sign, accompanied by the language 'I declare under penalty of perjury that the foregoing is true and correct.'" *United States v. Collazo-Castro*, 660 F.3d 516, 523 n.4 (1st Cir. 2011) (quoting Form PROB-12C). The latest version of Form PROB-12C still contains that language. *See* Form PROB-12C (revised May 2021) https://jnet.ao.dcn/sites/default/files/pdf/PROB-0012C-2.pdf (access restricted). As such, the probation officer's role in seeking revocation based on her own percipient observations, interventions, and interpretation render Officer Mojica an improper participant in the co-adjudication of violations and the fashioning of punishment.

**Third,** at the time of court/probation officer co-adjudication, the probation officer's recollection and interpretation of events were challenged and disputed. At

the time of the final hearing, significant disputes remained over what communication transpired between Appellant and probation officers, and there was significant dispute over when and how the internet-restricting conditions were subject to enforcement.

For example, Special Condition 31 required "Mr. Negr[ó]n [to] contribute to the cost of the monitoring service based on his ability to pay." A98. Going into the final revocation hearing, Officer Mojica's position was that Mr. Negrón was properly excused from for-profit monitoring from February through September 2022 but needed to start paying the monitoring company if he wanted to keep a smartphone. *See* A82-A83.

Mr. Negrón's request at the final hearing was for the imposition of a sliding scale so that, "[u]nder a plain, commonsense reading of Special Condition 31, Probation must cover the costs of monitoring software when Mr. Negrón is unemployed or unable to contribute to the cost of monitoring. This ensures Mr. Negron has a monitored electronic device enabling him to communicate and function." A99. But the probation officer's unilateral interpretation had "eliminated this clear instruction from the Court." A99.

Yet, as the government succeeded in dispensing with in-court final hearing testimony from Officer Mojica, the court's credibility observations of the officer

were out of the record and out of view of Mr. Negrón and counsel. This left Officer Mojica unable to be a party to the adjudication of a factual and interpretive issue that was integral to the judge's revocation and sentence determination.

***Fourth,*** the probation officer had an interest in the outcome of the case such that the officer's own stated recollection and interpretations in chambers disqualified the officer from taking part in the adjudication as an unbiased party. A probation officer's interest in the proceedings begins with the officer's need to protect their credibility, which in turn protects the officer's livelihood. In *Collazo-Castro*, this Court once opined that officers hold such a unique role in court and possess such recognized credibility that they need not to swear to facts presented to obtain an arrest warrant. *See Collazo-Castro*, 660 F.3d at 523.

If an officer lost credibility with a district court or magistrate, of course, the officer would retain less value as an officer of the court. And *Collazo-Castro* predates judicial events demonstrating that fact-witness probation officers are fallible human beings like the rest of us. In September 2021, U.S. Probation Officer Enoch Eller Jr. for the Southern District of Georgia admitted he lied about performing his supervisory duties, entering a guilty plea to one felony count of false statements. *See United States v. Enoch Eller, Jr.*, 21-cr-70-DHB-CLR, ECF No. 14 (plea agreement) (S.D. Ga. Sept. 22, 2021). From the looks of USPO Eller's case, it was not the case of

someone bribed to make false statements or drive by addiction or the like. He was a career government servant who spent a 13-year period telling his supervisors and judges "that he performed drug testing and conducted home visits for certain individuals under his supervision when he had not done so." Dep't of Justice, Press Release: Former Federal Probation Officer Pleads Guilty to False Statements Regarding Performance of Supervisory Duties, Sept. 21, 2021, https://justice.gov/usao-sdga/pr/former-federal-probation-officer-pleads-guilty-false-statements-regarding-performance.

Similarly, USPO Dennis Edward Bresnahan showed the peril in assuming the vocation of probation officer renders a person beyond partiality. *See* Plea Agreement, *United States v. Dennis Edward Bresnahan*, 18-cr-195-RWP-HCA, ECF No. 56 (D. Minn. Mar. 1, 2019). When USPO Bresnahan was investigated by FBI special agents regarding inappropriate conduct with people he supervised, he made criminal false statements that were punished with 30 months' imprisonment and two years' supervised release. *Id.*, ECF No. 93 at 20-21 (court's sentencing opinion and order). While USPO Eller may have been driven to fudge his reports because he felt overworked and USPO Bresnahan lied to prevent federal "officers from discovering that he had physically and emotionally harmed many more women," *id.* at 16, the net result for this Court's analysis is that the thousands of people working as federal

probation officers are all subject to the basic human weaknesses we all are. When they meet in chambers with a judge *before* an adjudicative hearing to agree that violations took place and agree as to punishment, as occurred here, the neutral-and-detached-arbiter requirement for due process is left unmet. *Morrissey*, 408 U.S. at 489.

*Fifth*, the fact-witness probation officer indicated feeling that Appellant had targeted Officer Mojica with intense criticism. According to Officer Mojica's uncertified translations, Appellant had texted the officer comments like, "truly I'm good without seeking you," A78, and had accused Officer Mojica of "blindly complying with her duties even as she knew they are useless," A84. Officer Mojica also indicated Appellant had "accused" her "of working without a conscience as she enforces useless conditions." A84. And he'd further "accused [Officer Mojica] of persecution and not allowing him to remake his life." A79.

While the Rule 32.1 process allows the probation officer no role in the adjudicative process, the subject allegations are consistent with circumstances that would have disqualified the officer being a part of a neutral adjudicative process. In *In re Murchison*, 349 U.S. 133, 138 (1955), the question was whether a criminal contempt proceeding "where the same judge presiding at the contempt hearing had also served as the 'one-man grand jury' out of which the contempt charges arose" complied with

due process. 349 U.S. at 134. The Supreme Court held that it did not. Officer Mojica recommended revocation after a highly personalized set of allegations that included interactions that Officer Mojica's supervisor responded to by "addressing Mr. Negrón-Cruz's disrespectful attitude and warn[ing] him that such behavior will not be tolerated." A79. "[E]very procedure which would offer a possible temptation to the average man as a judge … not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law." *Tumey* v. *Ohio*, 273 U.S. 510, 532 (1927).

While Officer Mojica may harbor no actual bias and may be equipped to weigh the scales of justice fairly, the adjudicators of supervision violations must perform their high function in a manner that upholds not only the substance but the appearance of justice. *See Offutt v. United States*, 348 U.S. 11, 14 (1954) ("[J]ustice must satisfy the appearance of justice."). Which is why, simply put, *Morrissey* held that, "when review of an initial decision is mandated, the decisionmaker must be other than the one who made the decision under review." 408 U.S. at 485. Officer Mojica initially recommended revocation of supervised release, so she cannot also serve as member of the confidential adjudication unit to evaluate whether to revoke and what sentence to impose.

**C.    The neutral-and-detached-arbiter denial constitutes structural error.**

Certain structural errors so deprive the accused of basic trial protections such that the process fails to serve as a vehicle for reliably determining guilt or innocence. *See Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). When the district court secured supervised release jurisdiction through Appellant's 2015 guilty plea, sentencing, and judgment, due process protections flowed to any administrative proceedings related to supervised release-conditions compliance.

Structural errors are generally conceived of as events in a trial, "defect[s] affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Id*. at 310. "Unlike a garden-variety trial error, a structural error 'transcends the criminal process,' … by depriving a defendant of those 'basic protections [without which] a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.'" *United States v. Padilla*, 415 F.3d 211, 219 (1st Cir. 2005) (en banc) (first quotation from 499 U.S. at 311; second from *Rose v. Clark*, 478 U.S. 570, 577-78 (1986) (citation omitted)).

Concededly, a post-trial revocation proceeding falls outside the trial process. Nevertheless, the denial of a neutral and detached arbiter due to officer-district court

adjudicative unit is akin to the structural error given the specter of a biased adjudicator, which is a structural error. *See Tumey*, 273 U.S. at 517. As such, reversal is warranted.

In the alternative, the denial of this constitutional due process right was harmful, and the government cannot show otherwise. Counsel objected to the district court's ex parte consideration of "information that was outside the confines of the preliminary hearing that was held in this case." A139. As counsel objected to reimposition of conditions without a sliding scale, the district court sided with probation's disputed position that Appellant was somehow responsible for U.S. Probation not allowing a sliding scale for surveillance software costs. The exchange went as follows:

> **Defense Counsel:** Judge, additionally, with regard to condition number 31, … the cost of monitoring … is based on Mr. Negrón's ability to pay. I think it needs to make clear that if he is going to have to pay anything towards that system of monitoring, it should be imposed on a reasonable sliding scale that is—
>
> **The Court:** Yes, but he has to inform the probation officer of his income to see if he can be able to pay all of it or part of it or none of it.

A140.

Had the court based its determination solely on Officer Mojica's testimony, it would have observed no time at which probation had been deprived of information suggesting that Mr. Negrón had ever transcended indigence and subsistence after returning to the community from imprisonment. When asked why probation did not cover the cost when Mr. Negrón "wasn't able to pay … for the use of a phone, a smart phone which everyone uses in this day and age," Officer Mojica replied, "I don't have the answer to that question." A163-A164.

Moreover, the judge's revocation and sentence determination expressly made findings based on content that was not part of the government's case, which could have only been related in the court's pre-contested hearing adjudicative conference with Officer Mojica *See* A134. This includes Officer Mojica's never-testified-to allegation that Mr. Negrón lied to Officer Mojica on January 19, 2023, about working for Uber Eats, when he "had already had an active delivery account with Uber since January 4, 2023." A134. While Officer Mojica had made a similar allegation by unsworn motion on March 10, no supporting evidence of that allegation was ever presented when the prosecution proceeded only with allegations the magistrate found probable cause on March 6. A125-A132.

The same goes for Officer Mojica's allegation of a Special Condition 32 violation that was written about on March 27, 2023. A93. Like the March 10

assertion, it was not presented in the government's case. Yet, these played a stated role in the court's revocation determination and sentence pronouncement. *See* A133-A137 (sustaining violations not presented in the government's case).

## III. THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT RELIED ON UNTESTED, DISPUTED, EX PARTE SUBMISSIONS FROM PROBATION.

Separate from the pre-adjudication issued raised above, if "the probation officer reveals," ex parte, "new facts relevant to the sentencing calculus, those facts cannot be relied upon by the sentencing court unless and until they are disclosed to the parties and subjected to whatever adversarial testing may be appropriate." *Reyes-Correa*, 81 F.4th at 8 (citation omitted). As a result, "[a] district court's use of new information (meaning information not already found in the district court's record) that is significant (meaning 'materially relied on' by the district court in determining a sentence) can be reversible error." *United States v. Ramos-Carreras*, 59 F.4th 1, 5 (1st Cir. 2023) (citation omitted).

Here, the district court's pronouncement recited multiple statements and conclusions that were not presented in the government's case, a case relying expressly and solely on the transcript from the March 6 preliminary hearing. The remainder of the court's findings were necessarily dependent on ex parte probation-officer submissions. The impact of ex parte contact was especially grave in relation to the court's resistance to revising Special Condition 31 to include a sliding scale

and instructions that permit the improper-delegation issue raised by Mr. Negrón. *See* A140-A141. There, despite record evidence showing Officer Mojica had terminated Mr. Negrón's internet access until he could afford a monitoring fee, the district court adopted Officer Mojica's unsupported view that fault for termination of authorized internet access lay with Mr. Negrón for not "provid[ing] the probation officer with information … to determine how [the fee] is going to be paid, or if the probation office will pay all of it." A141.

## IV. THE DISTRICT COURT MADE A SIGNIFICANT ERROR OF LAW WHEN IT DENIED THE DEFENSE ACCESS TO A PSYCHOLOGICAL EXAMINATION REPORT CONDUCTED BY A DEPARTMENT OF JUSTICE CLINICIAN.

As Mr. Negrón argued, in proceedings threatening a person's liberty interests, "mental health is always important from both a mitigation and factual perspective." A109 (citing *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring), for the proposition that a person who commits "criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."). Once the court found a violation, it considered the factors under 18 U.S.C. § 3553(a) for sentencing, and Mr. Negrón had a right to present mitigating evidence on his behalf under *Morrissey* and Rule 32.1(b)(2)(E).

In this case, Mr. Negrón's latest evaluation was done following a lengthy involuntary commitment for mental health observation and treatment that the government improperly requested only to agree later to this Court's remand on September 19, 2021. A30 (*see* ECF Nos. 292-294); *see also* 1st Cir. No. 21-1077.

Here, probation was in custody of Mr. Negrón's latest psychological evaluation. Probation had apparently commissioned the evaluation after Mr. Negrón's release in 2022. And Mr. Negrón had a right to access it both as a record held by the Court and his personal medical record. As to documents held by court personnel, given the presumption of public access to public proceedings, it is "the party seeking to keep records sealed" that "bears the burden of justifying that secrecy, even where, as here, the district court already previously determined that those documents should be sealed." *United States v. Bacon*, 950 F.3d 1286, 1293 (10th Cir. 2020) (citation omitted). The decision to seal is "to be exercised in light of the relevant facts and circumstances of the particular case." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 599 (1978) (emphasis added). Like with a district court's statement of reasons, which a defendant has a right to access, there was "no basis for withholding the document" requested. *United States v. Morales-Negrón*, 974 F.3d 63, 67 (1st Cir. 2020) (remanding to grant access to restricted document). And, here, withholding the mental-health report violated Mr. Negrón's rights under Rule 32.1(b)(2)(E).

As such, this Court should remand and grant Mr. Negrón access to the report docketed by Officer Mojica at ECF No. 426.

## V.    REMAND SHOULD BE TO A DIFFERENT JUDICIAL OFFICER.

As this Court has long observed, "[i]t is difficult for a judge, having once made up his mind, to resentence a defendant." *Mawson v. United States*, 463 F.2d 29, 31 (1st Cir. 1972). It is therefore a fortiori more difficult to re-adjudicate responsibility for violations when a district court permitted a fact witness to take part in both factual determinations and its sentencing decisions. As such, "both for the judge's sake, and the appearance of justice," this Court should remand for further proceedings before a different judicial offer. *Id.*

Similarly, it is appropriate to remand to another judge where, as here, "the original sentence was grounded on unsupported findings of fact." *United States v. Colón-Cordero*, 91 F.4th 41, 58 (1st Cir. 2024) (citation omitted).

Likewise, where, as here, the court's determination was made in reliance on ex parte fact-witness communications, remand to a different judge is also supported. *See Ramos-Carreras*, 59 F.4th at 8; 28 U.S.C. § 2106.

## CONCLUSION

This Court should reverse the district court's judgment on revocation, reverse the sentence, strike Special Condition 31, grant access to Appellant's mental-health evaluation, and remand to another judicial officer.

**RESPECTFULLY SUBMITTED.**

September 3, 2024

**RACHEL BRILL**
Federal Public Defender

**FRANCO L. PÉREZ-REDONDO**
Assistant Federal Public Defender
Supervisor, Appeals Section

**s/KEVIN E. LERMAN**
Assistant Federal Public Defender
First Circuit Bar No. 1194361
241 F.D. Roosevelt Ave.
San Juan, Puerto Rico 00918-2441
(787) 281-4922
Kevin_Lerman@fd.org

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) by containing 11,704 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This is less than the 13,000-word limit.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface in Microsoft Word utilizing 14-point Equity font.

September 3, 2024

s/KEVIN E. LERMAN
Assistant Federal Public Defender

**CERTIFICATE OF SERVICE**

I CERTIFY that a true and exact copy of this APPELLANT'S BRIEF was filed with the Clerk of Court on September 1, 2024, using the CM/ECF system which will send notification to all parties of record, including counsel for the appellee.

September 3, 2024

s/KEVIN E. LERMAN
Assistant Federal Public Defender

# In the United States Court of Appeals for the First Circuit

———————————

**UNITED STATES OF AMERICA,**
*Appellee,*

v.

**ALEXIS D. NEGRÓN-CRUZ,**
*Defendant-Appellant.*

———————————

On Appeal from the United States District Court
for the District of Puerto Rico
D. Ct. No. 11-cr-229-FAB
Hon. Francisco A. Besosa, U.S. Senior District Judge

———————————————————————

**ADDENDUM TO APPELLANT'S OPENING BRIEF**

———————————————————————

**RACHEL BRILL**
Federal Public Defender
District of Puerto Rico
241 F.D. Roosevelt Ave.
San Juan, PR 00918
T. (787) 281-4922
F. (787) 281-4899
E. Kevin_Lerman@fd.org

**FRANCO L. PÉREZ-REDONDO**
Assistant Federal Public Defender
Supervisor, Appeals Section

**KEVIN E. LERMAN**
Assistant Federal Public Defender

*Attorneys for Defendant-Appellant*
**ALEXIS D. NEGRÓN-CRUZ**

# CONTENTS

**Judgment** (Nov. 9, 2013), ECF No. 429 .............................................................. 1-7

AO 245D (Rev. 09/19)   Judgment in a Criminal Case for Revocations
Sheet 1

# UNITED STATES DISTRICT COURT

District of Puerto Rico

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | (For **Revocation** of Probation or Supervised Release) |
| ALEXIS D. NEGRON-CRUZ (1) | Case No.  3:11-CR-00229 (FAB) |
| | USM No. 36586-069 |
| | AFPD Andrew McCutcheon |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ admitted guilt to violation of condition(s) _____ of the term of supervision.

☑ was found in violation of condition(s) count(s)  See below _____ after denial of guilt.

The defendant is adjudicated guilty of these violations:

| Violation Number | Nature of Violation | Violation Ended |
|---|---|---|
| Standard Condition No. 4 | "You must answer truthfully the questions asked  by your probation officer." | 03/30/2023 |
| Standard Condition No. 6 | "You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision  that he or she observes in plain view." | 03/30/2023 |
| Standard Condition No. 7 | "You must work full time (at least 30 hours per  week) at a lawful type of employment, unless the probation officer excuses | 03/30/2023 |

The defendant is sentenced as provided in pages 2 through ___6___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has not violated condition(s) _____ and is discharged as to such violation(s) condition.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

Last Four Digits of  Defendant's Soc. Sec. No.: _____

Defendant's Year of Birth: _____

City and State of Defendant's Residence:
_____

11/09/2023
Date of Imposition of Judgment

/S/ FRANCISCO A. BESOSA
Signature of Judge

Francisco A. Besosa, Senior U.S. District Judge
Name and Title of Judge

11/09/2023
Date

AO 245D (Rev. 09/19)     Judgment in a Criminal Case for Revocations
                         Sheet 1A

Judgment—Page    2    of    6

DEFENDANT:   ALEXIS D. NEGRON-CRUZ (1)
CASE NUMBER:  3:11-CR-00229 (FAB)

## ADDITIONAL VIOLATIONS

| __Violation Number__ | __Nature of Violation__ | __Violation Concluded__ |
|---|---|---|
| | you from doing so. If you do not have full-time employment you must try to  find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work  (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the  probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72  hours of becoming aware of a change or expected change." | |
| Standard Condition No. 13 | You must follow the instructions of the  probation officer related to the conditions of supervision. | 03/30/2023 |
| Special Condition No. 31 | "He shall consent to the installation of systems  that will enable the Probation Officer or his or her designee to monitor and filter any internet accessing and data storage device, owned or controlled by  Mr. Negrón. Mr. Negrón shall consent to, and cooperate with, unannounced examinations on any equipment owned or controlled by him, which may  result in retrieval and copying of all data from the device and any internal or external peripherals and may involve removal of the equipment to conduct a  more thorough inspection. Mr. Negrón shall immediately notify the Probation Office upon registration for access to any website or service that allows for:  communication with other users, uploading or downloading of files, posting of any material, etc. Notification shall include the site address, username,  password, pseudonyms, and logons. This includes, but is not limited to, social networks, cloud storage services, message boards, etc. Mr. Negrón shall contribute to the cost of the monitoring service based on his ability to  pay." | 03/30/2023 |
| Special Condition No. 32 | "He does not possess or use a computer, cellular telephone, or any other device with  internet accessing capability, at any time or place other than those with systems that will enable the Probation Officer or his or her designee to monitor and filter  any internet accessing." | 03/30/2023 |

Addendum 2

AO 245D (Rev. 09/19)    Judgment in a Criminal Case for Revocations
                        Sheet 2— Imprisonment

Judgment — Page ___3___ of ___6___

DEFENDANT:   ALEXIS D. NEGRON-CRUZ (1)
CASE NUMBER:  3:11-CR-00229 (FAB)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of :

Time Served.

☐   The court makes the following recommendations to the Bureau of Prisons:

☐   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

    ☐   at _____ ☐ a.m. ☐ p.m.   on _____ .

    ☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐   before 2 p.m. on _____ .

    ☐   as notified by the United States Marshal.

    ☐   as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

Addendum 3

AO 245D (Rev. 09/19)    Judgment in a Criminal Case for Revocations
                        Sheet 3 — Supervised Release

Judgment—Page ___4___ of ___6___

DEFENDANT:   ALEXIS D. NEGRON-CRUZ (1)
CASE NUMBER:   3:11-CR-00229 (FAB)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :

  Two-hundred and seventy (270) months, under the same conditions previously imposed on him, except that the condition of drug testing is eliminated.

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
        ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

Addendum 4

AO 245D (Rev. 09/19)    Judgment in a Criminal Case for Revocations
                        Sheet 3A — Supervised Release

Judgment—Page    5    of    6

DEFENDANT:   ALEXIS D. NEGRON-CRUZ (1)
CASE NUMBER:   3:11-CR-00229 (FAB)

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision.  These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so.  If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity.  If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction.  The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature  _____     Date  _____

Addendum 5

AO 245D (Rev. 09/19)   Judgment in a Criminal Case for Revocations
Sheet 3D — Supervised Release

Judgment—Page ___6___ of ____6____

DEFENDANT:  ALEXIS D. NEGRON-CRUZ (1)
CASE NUMBER: 3:11-CR-00229 (FAB)

## SPECIAL CONDITIONS OF SUPERVISION

Mr. Negron-Cruz  shall continue under the same conditions previously imposed on him, except that the condition of drug testing is eliminated.

Addendum 6