# United States Court of Appeals
## For the First Circuit

No. 23-1976

UNITED STATES OF AMERICA,

Appellee,

v.

ALEXIS D. NEGRÓN-CRUZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Gelpí, Lipez, and Rikelman,
Circuit Judges.

Kevin E. Lerman, Assistant Federal Public Defender, with whom
Rachel Brill, Federal Public Defender, and Franco L.
Pérez-Redondo, Assistant Federal Public Defender, were on brief,
for appellant.

Tory D. Roberts, Assistant U.S. Attorney, with whom W. Stephen
Muldrow, U.S. Attorney, Mariana E. Bauzá-Almonte, Assistant U.S.
Attorney, and Gregory B. Conner, Assistant U.S. Attorney, were on
brief, for appellee.

August 28, 2025

      **RIKELMAN**, <u>**Circuit Judge**</u>.    Alexis Negrón-Cruz was sentenced to ten years in prison and 25 years of supervised release after pleading guilty to one count of possession of child pornography.    Since Negrón finished his prison term, the district court has revoked his supervised release three times.

      In this appeal, Negrón challenges the second revocation ("Second Revocation").    He argues that we should reverse the Second Revocation judgment and vacate his sentence because the district court improperly considered ex parte statements from his probation officer.    Alternatively, he asks that we vacate two conditions of his supervised release that, taken together, allow him to access the internet only via devices with court-approved monitoring software.    In his view, these conditions are unconstitutional and unlawfully delegate judicial authority to the U.S. Probation Office.    On the record here, we find no legal error and accordingly affirm the Second Revocation judgment and sentence in full.

## I.    BACKGROUND

      Negrón pleaded guilty to one count of possession of child pornography in 2013.    The underlying facts involved Negrón sharing a video, in an online chatroom, of himself having sex with an individual who he claimed was a minor.    Subsequently, he shared additional videos of minors as young as five being sexually abused by others and attempted to arrange sex with an eight-year-old girl and a woman he believed was her mother.    The district court

sentenced him to ten years in prison and 25 years of supervised release. Negrón began serving his supervised release term in December 2019. One of the supervised release conditions prohibited Negrón from possessing any "device with internet accessing capability" without prior approval of a probation officer.

### A.    First Revocation

In February 2022, Negrón's supervised release was revoked ("First Revocation"). The district court determined that Negrón "had access[ed] . . . the internet without approval of the probation officer," among other violations. Negrón, who had been detained pending his revocation proceedings, was sentenced to time served and a new supervised release term of 25 years.

Because Negrón had violated an internet-related condition, the district court also imposed a new set of supervised release conditions governing internet access. Special Conditions 31 and 32, at issue in this appeal, read in relevant part:

> 31.    [Mr. Negrón] shall consent to the installation of systems that will enable the Probation Officer or his or her designee to monitor and filter any internet accessing and data storage device, owned or controlled by [him]. Mr. Negrón shall consent to, and cooperate with, unannounced examinations on any equipment owned or controlled by him, which may result in retrieval and copying of all data from the device and any internal or external peripherals and may involve removal [of] the equipment to conduct a more thorough inspection. . . . Mr. Negrón shall contribute to the cost of the monitoring service based on his ability to pay.

> 32. He shall not possess or use a computer,
> cellular telephone, or any other device with
> internet accessing capability, at any time or
> place other than those with systems that will
> enable the Probation Officer or his or her
> designee to monitor and filter any internet
> accessing.

Negrón began serving his new supervised release term under the modified conditions immediately.

### B.    Second Revocation

After Negrón was released to a homeless shelter in February 2022 and a few days into his new supervised release term, Negrón informed the Probation Office that he had acquired a smartphone. Officer Taisa Mojica, his probation officer, conferred with her supervisors, and then agreed that Negrón could keep the smartphone "until he could secure employment to cover the monitoring cost."

In March 2022, Officer Mojica learned that Negrón had secured a second smartphone. Negrón's primary smartphone was seized for forensic examination and, a few days later, so was his second smartphone. Negrón received his primary smartphone back at some point thereafter, but it seems that his second smartphone was never returned to him.

Six months later in September 2022, when Negrón was seeking to re-establish a relationship with one of his daughters, Officer Mojica reminded Negrón that the Probation Office needed to install the monitoring system on his primary smartphone. Negrón

- 4 -

had been employed in the months since February 2022 but nonetheless
stated that he was unable to pay for the monitoring software.
Officer Mojica responded that Negrón should then secure a phone
incapable of connecting to the internet.  The next day, Negrón
said that he would switch over to a cellular plan for his
smartphone that would no longer include internet.  Officer Mojica
rejected Negrón's proposal, since his smartphone could still
connect to the internet even without a data plan.  By early October
2022, Negrón still had not followed Officer Mojica's instruction,
so she told him to hand over his smartphone.  He complied but did
not provide the passcode, asserting that the phone had been factory
reset.

Negrón switched jobs in October but did not inform
Officer Mojica of his change in employment until mid-November.
Officer Mojica met with Negrón to address the matter, and Negrón
argued that he did not inform her earlier because he had handed
over his smartphone.  Officer Mojica once again instructed Negrón
to secure a basic phone incapable of connecting to the internet
because he was unable to pay for the monitoring software.  Officer
Mojica and Negrón then agreed that he would provide paystubs and
a formal letter indicating the change in employment, and he did so
in late November.

Officer Mojica and Negrón met again two months later in
January 2023, and Negrón provided her with his latest paystub.  He

also admitted that he had kept an iPad from his prior employer, had an unauthorized smartphone with internet access in his possession, and had applied for a job with Uber.  Probation officers visited his home in early February to confiscate the devices, but Negrón refused to relinquish the iPad and deleted his smartphone contacts before giving up his phone.

Later that month, Officer Mojica filed a motion requesting that the district court issue an arrest warrant charging Negrón with violating the terms of his supervised release.  After the warrant was issued, the court ordered that Negrón be detained pending his preliminary revocation hearing.

Negrón's preliminary revocation hearing took place on March 6, 2023, and Officer Mojica was the only witness.  The magistrate judge found probable cause for all but one of the alleged violations but nonetheless permitted Negrón to leave detention that day, subject to the same conditions of supervised release plus two additions: Negrón had to wear an electronic monitoring device and submit to home detention.

The next day, Officer Mojica discovered that Negrón had activated the SIM card from his original smartphone.  She then seized the smartphone for a forensic examination and initially instructed Negrón, as she had before, to get a phone incapable of connecting to the internet in the meantime.  But after concluding that finding a phone without internet access is functionally

- 6 -

impossible (because even flip phones might have internet access), she instructed Negrón to get a flip phone instead.

Twenty days after his smartphone was seized, on March 27, 2023, Negrón returned to the Probation Office to retrieve the phone, with the monitoring software finally installed. During his interactions with the probation officers that afternoon, he mentioned that he was continuing to deliver for Uber Eats and for his own online small business. It then became clear that Negrón had obtained yet another backup smartphone. In response to Officer Mojica's questions, Negrón explained that he had acquired the backup phone because he could not wait until the officers returned his original smartphone. At the end of this March 27 meeting, the Probation Office returned Negrón's original smartphone to him with the monitoring software installed and seized the newly discovered backup smartphone.

Officer Mojica filed a motion requesting another arrest warrant later that day. The warrant was issued, and Negrón was again detained. On April 13, the magistrate judge held another preliminary revocation hearing, which focused on Negrón's alleged violations of his supervised release conditions since March 6. This time, Officer Mojica and Officer Guillermo Montañez, a supervisor for the Probation Office, both testified. The magistrate judge again found probable cause to conclude that Negrón

had violated his supervised release conditions and ordered Negrón detained pending his final revocation hearing.

The district court held the final revocation hearing in November 2023. During his allocution, Negrón expressed significant frustration about how the Probation Office had enforced his supervised release conditions. He concluded by stating that "while [Officer] Mojica" and two other officers "are working at the [P]robation [O]ffice, you can leave me in jail." The district court took judicial notice of the preliminary revocation hearing on March 6. It then ruled that Negrón had violated Special Conditions 31 and 32, among other conditions,[1] and revoked the supervised release term that was imposed as part of the First Revocation. The court sentenced Negrón anew to time served and 270 months (22 years and six months) of supervised release, with the same supervised release conditions that were imposed following the First Revocation, including Special Conditions 31 and 32.

### C.    Third Revocation

In December 2024, while appellate briefing in this case

---

[1] The district court also concluded that Negrón violated Standard Conditions 4, 6, 7, and 13. Condition 4 requires Negrón to answer the Probation Office's questions truthfully; Condition 6 permits the Probation Office to meet Negrón anywhere at any time; Condition 7 requires regular employment in a lawful occupation; and Condition 13 requires Negrón to follow the Probation Office's instructions. These conditions are not challenged on appeal.

was underway, the district court revoked Negrón's supervised release for a third time ("Third Revocation"). It determined that Negrón had again violated Special Condition 31, as well as other standard and special conditions. The court sentenced him to two years in prison and 268 months (22 years and four months) of supervised release. Negrón has separately appealed the Third Revocation to this court. See United States v. Negrón-Cruz, No. 25-1017 (1st Cir. docketed Jan. 8, 2025).

## II.  DISCUSSION

We have jurisdiction to hear Negrón's appeal from the Second Revocation under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).[2]

---

[2] Given our "obligation to inquire sua sponte into our jurisdiction" in every case, Doyle v. Huntress, Inc., 419 F.3d 3, 6 (1st Cir. 2005), we also consider whether the Third Revocation moots this appeal from the Second Revocation. We conclude that it does not.

"[A] case is moot when the court cannot give any effectual relief to the potentially prevailing party." ACLU of Mass. v. U.S. Conf. of Cath. Bishops, 705 F.3d 44, 52 (1st Cir. 2013) (quotation marks and citation omitted). "An appeal from an order revoking supervised release is ordinarily moot if the sentence is completed before the appeal is decided." United States v. Mazzillo, 373 F.3d 181, 182 (1st Cir. 2004) (per curiam). But such an appeal is not moot if the defendant is still serving his supervised release term. See United States v. Reyes-Barreto, 24 F.4th 82, 86 (1st Cir. 2022). In such cases, a defendant still "has a stake in the outcome of [an] appeal" because he "could seek equitable relief by way of a motion to modify the terms of his supervised release" or "file a motion to terminate his supervised release early." Id. at 85-86 (citing 18 U.S.C. § 3583(e)(1)-(2)).

The reasoning of Reyes-Barreto applies here. In determining a sentence for the Third Revocation, the district court relied in part on Negrón's "pattern of recurrent noncompliance" with his

As we previewed above, Negrón focuses on two primary arguments. First, he requests that we reverse the Second Revocation judgment and vacate his sentence. In his view, the district court improperly considered ex parte statements from Officer Mojica during his revocation proceedings, in violation of due process and Federal Rule of Criminal Procedure 32.1. Second, he challenges the district court's imposition of Special Conditions 31 and 32. Those conditions, he argues, are unconstitutional and amount to impermissible delegations of judicial authority to the Probation Office.

### A.    Ex Parte Communications

Negrón asks that we reverse the Second Revocation judgment and vacate his sentence because the district court impermissibly relied in part on ex parte statements from Officer Mojica during the final revocation hearing. We disagree and conclude that the district court's actions do not warrant reversal. Before we explain our reasoning, we recap the relevant proceedings before the district court and sketch out the legal framework.

### 1.    Relevant Proceedings

We begin with the proceedings that form the backdrop of Negrón's ex parte communication challenge. Officer Mojica filed

---

supervised release conditions. Thus, if we were to vacate the Second Revocation, Negrón could seek equitable relief to reduce the supervised release term imposed as part of the Third Revocation. See 18 U.S.C. § 3583(e)(1)-(2).

two motions with the district court after the March 6, 2023
preliminary revocation hearing -- first, an informative motion
filed on March 10, and second, a motion for an arrest warrant filed
on March 27 -- alleging additional violations of Negrón's
conditions since March 6.

Two factual allegations in those motions are critical
for our purposes.  In the first motion, Officer Mojica claimed:

> [O]n January 19, 2023, [Officer Mojica] met
> with Mr. Negrón-Cruz . . . . During the
> intervention, Mr. Negrón-Cruz stated that he
> applied for a job "with Uber." . . . On March
> 9, 2023, [Officer Mojica] became aware that
> Mr. Negrón-Cruz is or has been employed by
> Uber.

She asserted that Negrón's conduct violated Standard Condition 7,
which requires timely notice of any change in employment.  In the
second motion, Officer Mojica claimed:

> On March 27, 2023, . . . . Mr. Negrón-Cruz
> . . . admitted to having a backup cellphone.
> When advised that he could not have had a
> back-up phone without the officer's
> authorization, he responded that he cannot
> wait until the officer decides to install the
> required monitoring software.

The unauthorized possession of the phone, she alleged, was a
violation of Negrón's supervised released conditions.  The
district court issued the arrest warrant, and Negrón was detained.

The preliminary revocation hearing that focused on these
particular allegations was held in April 2023.  At the hearing,
Officers Mojica and Montañez testified that the Probation Office

found and seized Negrón's unauthorized backup smartphone. Negrón, for his part, did not introduce any evidence to the contrary or even dispute that account. His counsel argued instead that the phone restrictions were "Byzantine" and trapped Negrón in a cycle of recurring revocation. Further, the government did not elicit any testimony or introduce other evidence at the hearing to support the allegation that Negrón failed to report his employment with Uber. The magistrate judge ultimately found "probable cause that the defendant violated his conditions of supervised release as alleged in . . . [the] motions filed by Probation."

The case then proceeded to the final revocation hearing in November 2023, during which the district court had the following exchange with defense counsel:

> THE COURT: I have been speaking with [Officer] Mojica about what to do today with Mr. Negrón, and we both agreed that the best thing to do would be to give him time served. Is that okay with you, Mr. McCutcheon?
>
> MR. MCCUTCHEON: Judge, it's fine for me. I would probably have to lodge objections, just because he would ask me to do that, to the conditions of supervised release.[3]

The court then took judicial notice of the transcript of the March 2023 preliminary revocation hearing, making no mention of the April

---

[3] The district court also asked Officer Mojica whether the "supervised release terms" that she had suggested imposing "were the same that were imposed before," to which she replied "yes" (minus a drug condition not relevant to this appeal).

2023 preliminary revocation hearing.  (Nor could it, given that the transcript for the April hearing was not ready until two months after the November final revocation hearing took place.)

The district court ultimately concluded that Negrón violated his supervised release conditions, including Standard Condition 7 and Special Condition 32.  Then, before imposing its sentence, the court recited its findings of fact.  It determined that:

> On January 19, 2023, Mr. Negrón lied to his probation officer, [Officer] Mojica, . . . when he stated that he had applied [for] a job with Uber when in fact information provide[d] by the Government confirmed that Mr. Negrón had already had an active delivery account with Uber since January 4, 2023.

The court also found:

> [O]n March 27, 2023, . . . Mr. Negrón admitted to having a cell phone.  When advised that he could not have a backup phone without the officer's authorization, he responded that he could not wait until the officer decided to install the required monitoring software. This behavior constitute[s] violations of standard condition number 4 and special condition number 32 . . . .

At the end of the hearing, Negrón objected to the court's factual findings on ex-parte-communication grounds.

The district court then imposed a prison term of time served and a renewed supervised release term of 270 months, which was necessary in its view "[t]o reflect the seriousness of Mr. Negrón's noncompliant behavior and to protect the public."

- 13 -

### 2.    Legal Overview

The sweep of information that a sentencing court may consider is "broad in scope," but it is not unlimited.  United States v. Reyes-Correa, 81 F.4th 1, 7 (1st Cir. 2023) (quoting Pepper v. United States, 562 U.S. 476, 489 (2011)).  The Due Process Clause of the Fifth Amendment to the U.S. Constitution guarantees that "[n]o person shall be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  And Federal Rule of Criminal Procedure 32.1 requires that a defendant subject to revocation proceedings "is entitled" to "disclosure of the evidence against the person" and "an opportunity to appear, present evidence, and question any adverse witness," subject to an exception not applicable here.  Fed. R. Crim. P. 32.1(b)(2)(B)-(C).  Together, these provisions ensure basic fairness to a defendant in revocation proceedings, including by requiring that the "defendant be apprised of the information to be relied on in sentencing and [have] an opportunity to challenge and rebut such information."  Reyes-Correa, 81 F.4th at 8 (citation omitted).

Some ex parte communications between a probation officer and a district court are lawful.  "[A]s the sentencing court prepares for the revocation and sentencing hearing, '[e]x parte communication between the probation officer and the court is usually permissible where the court is merely seeking advice or

analysis, . . . and the probation officer and the court may consult privately about certain issues incident to criminal sentencing.'" Id. (second alteration and omission in original) (quoting United States v. Marrero-Pérez, 914 F.3d 20, 25 (1st Cir. 2019)).  That is in part because a "probation officer is simply an extension of the court itself," and "a sentencing court's communications with the probation officer are fundamentally different from its communications with third parties." United States v. Bramley, 847 F.3d 1, 6 (1st Cir. 2017).

When a sentencing court is not merely seeking advice and analysis, however, its reliance on an ex parte communication from a probation officer can be reversible error if the communication conveys "new information" that is "significant." Reyes-Correa, 81 F.4th at 8 (quoting United States v. Ramos-Carreras, 59 F.4th 1, 5 (1st Cir. 2023)).  Information is "new" when it is "not already found in the district court's record," and it is "significant" when it is "'materially relied on' by the district court in determining a sentence." Id. (quoting Ramos-Carreras, 59 F.4th at 5).  Thus, new and significant facts relayed solely through ex parte communications "cannot be relied upon by the sentencing court unless and until they are disclosed to the parties and subjected to whatever adversarial testing may be appropriate." Bramley, 847 F.3d at 7.

### 3.  Analysis

We now turn to Negrón's challenge here.  Negrón argues that the district court's remark that it "[had] been speaking with [Officer] Mojica about what to do today with Mr. Negrón" and that they had "both agreed that the best thing to do would be to give him time served" was evidence of an ex parte conversation.  That conversation alone, of course, would not necessarily amount to error if it merely concerned "advice or analysis" about the length of Negrón's prison term.  Reyes-Correa, 81 F.4th at 8.  But Negrón points to two facts -- first, his possession of a backup smartphone on March 27, and second, his employment history with Uber -- that he alleges were conveyed in the district court's meeting with Officer Mojica and that he claims warrant closer scrutiny.

The parties agree that Negrón timely objected to the use of these facts in sentencing, so our review is for abuse of discretion.  See id. at 7.  But Negrón's objection to these ex parte communications did not immediately follow each of the district court's factual findings, so the court did not clarify how it reached these particular conclusions.  Cf. Bramley, 847 F.3d at 5 (reasoning that "timely objection[s]" can "shed light on the nature of the conversations").  In any event, we review what is in the record (and what is not) to assess how the court arrived at its findings, noting that "the district judge had to learn the allegations from somewhere."  Ramos-Carreras, 59 F.4th at 6.

First, we consider the district court's determination
that Negrón admitted to having an unauthorized smartphone on March
27, 2023.  The district court did not abuse its discretion by
relying on this fact because, even if it surfaced in an ex parte
communication, the information was not "new."  Reyes-Correa, 81
F.4th at 8.  To be sure, the fact was highlighted at the April
preliminary revocation hearing, which had yet to be transcribed,
so we assume favorably to Negrón that the district court indeed
learned about it during an ex parte conversation.  But even so,
the Probation Office's March 27 motion for an arrest warrant
alleged that Negrón possessed an unauthorized smartphone on that
day.  And we have previously held that the "explicit mention" of
information in an arrest warrant motion makes it "difficult to
characterize [the information] as 'new information' or
extra-record evidence."  Id. at 8-9.  Nor did Negrón ever dispute
that he possessed the unauthorized smartphone, even when given a
chance to do so at the April preliminary revocation hearing.  When
a defendant has not contested a fact supposedly conveyed in an ex
parte communication, his argument "that he was unprepared for [that
fact] to play a role in his ultimate sentencing" is less
persuasive.  Id. at 8.

Second, we evaluate the district court's conclusion that
Negrón "lied" to Officer Mojica on January 19, 2023, about his
employment with Uber because he "already had an active delivery

account with Uber since January 4, 2023." This finding appears to refer to "new" and "significant" facts shared in an ex parte communication, so it was an abuse of discretion for the district court to rely on those facts. Cf. Ramos-Carreras, 59 F.4th at 7 (holding that, under the plain error standard, a district court's recital of "extraneous non-record avowals without identifying the source or providing notice to [the defendant]" in a final revocation hearing was "clear error"). From our review of the record, there was no allegation or evidence of Negrón lying to Officer Mojica on January 19 or of Negrón's employment history with Uber prior to that date, making the conveyed information "new." Id. And although the district court never expressly explained which supervised release conditions Negrón's "lie[]" violated, it recited its finding that he lied among the list of other violations, leaving us to think that the court "materially relied on" these facts when determining his sentence. Id. Thus, the district court's reliance on these facts was unlawful.

That error, however, was harmless. A procedural sentencing "error is harmless if 'the error did not affect the district court's selection of the sentence imposed.'" Reyes-Correa, 81 F.4th at 9 (quoting Williams v. United States, 503 U.S. 193, 203 (1992)). Here, the district court recited two other instances when Negrón had lied to a probation officer and one other instance when he had failed to give timely notice of a

change in employment, all of which are unchallenged on appeal.  So even without the alleged misrepresentation on January 19, Negrón would nonetheless have violated the same conditions of supervised release.  And Negrón offers no basis to conclude that, without this particular finding, the court would have imposed a different sentence.  Thus, we determine that the district court's reliance on an ex parte communication about the supposed lie was "unlikely" to "influence[] the sentence."[4]  Reyes-Correa, 81 F.4th at 9.

Finally, Negrón argues that the district court should not have consulted Officer Mojica at all.  In his view, Officer Mojica had an improper interest in the outcome of the case and undermined the appearance of justice in the revocation proceedings simply because she had been Negrón's supervising probation officer.  But Officer Mojica's supervisory authority is an extension of the district court's powers, see Bramley, 847 F.3d at 6, so her participation in the revocation proceedings, standing alone, cannot be the basis for error.  Indeed, Negrón does not

---

[4] Negrón also contends that the district court's reliance on facts learned ex parte is a structural error, not subject to harmless error analysis, and requires reversal.  The Supreme Court "has classified an error as structural in only a very limited class of cases."  United States v. Rivera-Rodriguez, 617 F.3d 581, 604 (1st Cir. 2010).  And Negrón offers no authority to suggest that ex parte communications with a probation officer before a revocation hearing result in structural error.  His only citation in support is to Tumey v. Ohio, which involved a judge with a financial interest in the outcome of a trial and therefore is clearly inapposite.  See 273 U.S. 510, 535 (1927).  Thus, we reject this argument based on the briefing before us.

cite to any precedent that supports the notion that her mere involvement in the proceedings, without any allegations of misconduct or legal error, would be problematic. Cf. Reyes-Correa, 81 F.4th at 8-10 (making no issue of the fact that the probation officer who allegedly engaged in ex parte communication was the officer supervising the defendant). Thus, with no other developed argument by Negrón for disturbing the district court's ruling, we affirm the Second Revocation judgment and sentence.

### B.    Special Conditions 31 and 32

Now we turn to Negrón's prospective challenges to Special Conditions 31 and 32. In his view, these conditions violate his First and Fifth Amendment rights and unlawfully delegate judicial power to the Probation Office.[5]

Negrón objected to Special Conditions 31 and 32 at the final revocation hearing, so we review the district court's imposition of these special conditions for abuse of discretion. See United States v. Perazza-Mercado, 553 F.3d 65, 69 (1st Cir. 2009). Under that umbrella standard, "we inspect fact findings

---

[5] In the conclusion of his appellate brief, Negrón requests that we vacate only Special Condition 31. But, at other points in his brief, he challenges the "complex of conditions" that limit his internet access. And Special Condition 31's requirement that Negrón use monitoring software cannot be enforced without the ban on unauthorized devices mandated by Special Condition 32. Thus, for purposes of our analysis, we assume that Negrón intends to challenge both special conditions to the extent they restrict his constitutional rights.

for clear error, legal issues de novo[,] . . . and judgment calls with some deference."  United States v. McCullock, 991 F.3d 313, 317 (1st Cir. 2021).[6]

### 1.    Ability to Pay

We begin with Negrón's first constitutional challenge. Negrón argues that Special Condition 31 is unlawful because the Probation Office enforces it in a manner that requires him to pay the internet monitoring fee regardless of his financial circumstances.  That supposed policy, he maintains, violates the Fifth Amendment's equal protection guarantee.

We disagree that Special Condition 31 violates Negrón's equal protection rights based on the arguments before us.  The Fifth Amendment limits a district court's power to revoke an

---

[6] Relying on United States v. Eaglin, Negrón urges us to "conduct a more searching review" of the factors governing special conditions restricting internet access, which pose "heightened constitutional concerns."  913 F.3d 88, 95 (2d Cir. 2019).

Eaglin's standard, however, is not the law of our circuit. We have applied the abuse of discretion standard in each of our cases analyzing supervised release conditions restricting internet access.  See Perazza-Mercado, 553 F.3d at 69; United States v. Stergios, 659 F.3d 127, 133 (1st Cir. 2011); United States v. Ramos, 763 F.3d 45, 58 (1st Cir. 2014); United States v. Hinkel, 837 F.3d 111, 125 (1st Cir. 2016); United States v. Aquino-Florenciani, 894 F.3d 4, 6 (1st Cir. 2018); United States v. Windle, 35 F.4th 62, 67 (1st Cir. 2022).  And we have not applied a more rigorous standard when evaluating special conditions posing other types of constitutional concerns.  See, e.g., United States v. Millette, 121 F.4th 946, 953-54 (1st Cir. 2024) (special condition that impaired defendant's "constitutional interest in parenting his daughter"); United States v. Del Valle-Cruz, 785 F.3d 48, 58 (1st Cir. 2015) (similar).

indigent defendant's supervised release based solely on the nonpayment of fines. See Bearden v. Georgia, 461 U.S. 660, 672-73 (1983); see also United States v. Merric, 166 F.3d 406, 411 (1st Cir. 1999) ("Obviously, a court could not properly make it a condition of probation or supervised release that a penniless defendant make immediate payments, nor can we imagine sending [a] defendant back to jail where he had done his best to comply with an installment schedule."). But revocation on nonpayment grounds is permitted if a defendant "willfully refuse[s] to pay" or does not "make sufficient bona fide efforts to seek employment or borrow money in order to pay." Bearden, 461 U.S. at 668.

To begin, Special Condition 31 is not unconstitutional on its face. Because the special condition requires the software-monitoring fee to be assessed based on Negrón's "ability to pay," it does not require revocation solely on the basis of nonpayment. Thus, it does not violate equal protection.[7] See Merric, 166 F.3d at 411; see also United States v. Santarpio, 560 F.2d 448, 455-56 (1st Cir. 1977) (upholding special condition requiring payment to government so long as it is "enforced with proper regard to the question of the defendant's ability to pay").

Negrón also advances an as-applied challenge to Special Condition 31. He argues that the Probation Office knew full well

---

[7] The government does not contest the application of Bearden to Special Condition 31.

that he was indigent and that he never "materially withheld information" about his income, raising important points for his ongoing supervision.  The Probation Office cannot, consistent with Negrón's constitutional rights, require him to pay the monitoring fee if he is financially unable to do so.  See Bearden, 461 U.S. at 672-73.  Indeed, it cannot enforce the payment requirement "without a finding that the funds are available." United States v. Chorney, 63 F.3d 78, 83 (1st Cir. 1995) (quoting Santarpio, 560 F.2d at 455) (requiring such a finding for supervised release conditions directing defendants to pay the costs of their court-appointed counsel).  Similarly, the Probation Office cannot prohibit Negrón from using internet-capable devices unless it first determines that he has available funds to offset some of the costs of monitoring those devices but nevertheless has willfully refused to pay any portion of those costs.

But Negrón's as-applied challenge is ultimately unripe. Negrón does not contend that we should vacate the Second Revocation because the Probation Office enforced Special Condition 31 in a manner that violated his equal protection rights.  And the paystubs that Negrón provided to Officer Mojica in November 2022 and January 2023 are not in the record, nor did Negrón present a developed argument to the district court or to us about why his income as reflected on those paystubs would prohibit him from covering any of the software monitoring costs.  Rather, Negrón's counsel

expressly stated at oral argument before us that his constitutional challenges to this condition are prospective.  He requested that we strike the condition as drafted and "provide guidance" to the district court and the Probation Office on how to craft and enforce any similar condition in the future.  Yet our court has held that we cannot consider prospective challenges to supervised release conditions that rely on the "unusually inappropriate or ineffective way" that the condition may be implemented.  United States v. Medina, 779 F.3d 55, 67 (1st Cir. 2015); see also United States v. Hood, 920 F.3d 87, 94 (1st Cir. 2019); United States v. Sebastian, 612 F.3d 47, 52 (1st Cir. 2010); United States v. York, 357 F.3d 14, 25 (1st Cir. 2004).  Unlike facial challenges, such as-applied challenges "depend on the particular way in which" the Probation Office "may choose" to enforce the special condition.  Medina, 779 F.3d at 67; see also Hood, 920 F.3d at 94 (explaining that an as-applied challenge, "unlike [a] facial challenge, . . . necessarily depends on future factual contingencies").  Thus, we conclude that Negrón's as-applied equal protection challenge is "not ripe for our review," Hood, 920 F.3d at 94, and that Special Condition 31 does not violate equal protection on its face.

Nevertheless, we repeat that, under our precedent, the Probation Office cannot require Negrón to pay for monitoring without a finding that he has the financial ability to do so, nor

can it ban Negrón from using the internet altogether without determining that he has willfully refused to pay what he can.

## 2. Access to the Internet

Next, Negrón contends that Special Conditions 31 and 32 stand "to periodically cut off internet access for time periods so excessive [that] they violate the First Amendment."  In his view, the Probation Office "gave no explanation for why there was a twenty[-]day delay in the installation of the software" where the process "takes only one hour," and that gap in access resulted in an "excessive and unjustified" restriction of his First Amendment rights.  Based on the specific arguments before us, we conclude that there has been no First Amendment violation.

To evaluate a constitutional challenge to a condition of supervised release, we must analyze whether the condition indeed "intrudes upon a constitutionally protected right." United States v. Smith, 436 F.3d 307, 311 (1st Cir. 2006).  And even if it does, we will vacate a condition only if we determine that, "on a given set of facts, a particular restriction" on a defendant's liberty "is clearly unnecessary."  Id. at 310 (quoting United States v. Brown, 235 F.3d 2, 7 (1st Cir. 2000)) (upholding special condition restricting the fundamental right to associate with a close family member); see also United States v. Marino, 833 F.3d 1, 12 (1st Cir. 2016) (same).

- 25 -

To begin, there is, of course, a constitutional right at stake. The First Amendment's free speech guarantee protects Negrón's right to access the internet. See Packingham v. North Carolina, 582 U.S. 98, 107 (2017) (holding that a state law barring sex offenders from accessing social media websites was "unprecedented in the scope of First Amendment speech it burden[ed]"); Berge v. Sch. Comm. of Gloucester, 107 F.4th 33, 40 (1st Cir. 2024) (noting that the First Amendment's "protections apply to the 'vast democratic forums of the internet'" (quoting Packingham, 582 U.S. at 104)); see also United States v. Eaglin, 913 F.3d 88, 96 (2d Cir. 2019) (reading Packingham to hold that there is "a First Amendment right to access the Internet"); United States v. Ellis, 984 F.3d 1092, 1105 (4th Cir. 2021) (holding that "an internet ban implicates fundamental rights").

Further, as the government concedes, Special Conditions 31 and 32 restrict Negrón's First Amendment rights. See Smith, 436 F.3d at 310 (concluding that the condition there "impinge[d] upon" a "constitutionally protected" right). These conditions require that Negrón access the internet only on devices that are equipped with monitoring software. See United States v. Windle, 35 F.4th 62, 68 (1st Cir. 2022) (evaluating whether a monitoring condition was clearly unnecessary to deter the defendant from future crime).

That said, we cannot conclude that Special Conditions 31 and 32 violate the First Amendment based on the arguments presented by Negrón here.  According to Negrón, "the present complex of conditions impose[s] a virtually total ban on internet access at any time."  To be clear, our circuit has repeatedly held that a total ban on internet access is the kind of "broad-brush, untailored approach to sculpting the conditions of supervised release" that results in "'a greater deprivation of liberty than is reasonably necessary' to achieve the penal goals Congress has identified." United States v. Hinkel, 837 F.3d 111, 125 (1st Cir. 2016) (quoting 18 U.S.C. § 3583(d)(2)); see also United States v. Ramos, 763 F.3d 45, 61-62 (1st Cir. 2014); Perazza-Mercado, 553 F.3d at 69-70.

But Special Conditions 31 and 32 impose a monitoring requirement, which "is not a complete or partial ban" on internet access.  Windle, 35 F.4th at 68 (emphasis added) (upholding imposition of monitoring condition for defendant convicted of internet fraud); cf. also United States v. Aquino-Florenciani, 894 F.3d 4, 7 (1st Cir. 2018) (rejecting "total ban" argument where defendant, who was convicted of child pornography offenses, was permitted to use devices "subject to approval from his probation officer and electronic monitoring").  Rather, monitoring conditions are "narrowly tailored tools for reaching the appropriate balance between monitoring an offender in order to

protect the public, while still allowing him some reasonable internet access." Ramos, 763 F.3d at 61-63 (striking a total internet ban on a defendant convicted of a child pornography offense not involving the internet, but leaving the monitoring condition in place); see also Perazza-Mercado, 553 F.3d at 73-74 (striking a total ban on home internet use by defendant convicted of sex offense not involving the internet, but noting that courts can "fashion precise restrictions" on internet usage like monitoring-software requirements).[8] Thus, on their face, Special Conditions 31 and 32 do not run afoul of the First Amendment.

Negrón next contends that Special Conditions 31 and 32, as applied, stand "to periodically cut off internet access for time periods so excessive [that] they violate the First Amendment." He complains that the Probation Office "gave no explanation for why there was a twenty[-]day delay in the installation of the software" in March 2023, where the process "takes only one hour." He further claims that this substantial gap in internet access resulted in an "excessive and unjustified" restriction of his First Amendment rights.

Twenty days without internet access is, indeed, a substantial restriction by the government on an individual's First

---

[8] Unlike the defendants in these cases, Negrón does not challenge Special Conditions 31 and 32 as not reasonably related to the statutory sentencing factors. See 18 U.S.C. § 3583(d)(1).

Amendment rights.  But, again, Negrón confirmed at oral argument that his constitutional challenges to the monitoring requirement are purely prospective.  And the question of whether the Probation Office's manner of enforcing a generally permitted monitoring requirement is "clearly unnecessary" is heavily fact-dependent.  See Hood, 920 F.3d at 94; Medina, 779 F.3d at 67; Sebastian, 612 F.3d at 52; York, 357 F.3d at 25.  For example, the government contends that the 20-day delay reflects the time it took to conduct a forensic examination of Negrón's phone on top of installing the monitoring software.  And the record does not reflect what is a reasonable time period for such a forensic examination.  Thus, we also must dismiss Negrón's as-applied First Amendment challenge as unripe and affirm Special Conditions 31 and 32 as otherwise facially constitutional.

### 3.  Delegation of Judicial Power

We now turn to Negrón's final challenge.  He argues that Special Conditions 31 and 32 unlawfully delegate the core judicial power to decide "whether or not his internet will be monitored."

Article III of the U.S. Constitution prohibits "federal courts from delegating to nonjudicial officers (such as probation) their core judicial function, including the imposition of conditions of supervised release."  United States v. Morales-Cortijo, 65 F.4th 30, 35 (1st Cir. 2023).  To determine whether a special condition infringes on the core judicial

function, "we distinguish between delegations that merely task the probation officer with performing ministerial acts or support services and those that permit the officer to decide the nature or extent of the punishment itself." Id. at 36 (citation modified) (quoting United States v. Mike, 632 F.3d 686, 695 (10th Cir. 2011)). If we conclude that a special condition amounts to an unlawful delegation, then we vacate the relevant special condition. See United States v. Sepulveda-Contreras, 466 F.3d 166, 173 (1st Cir. 2006).

Negrón makes two delegation arguments, but we conclude that neither ultimately prevails. First, he contends that the Probation Office's power to "[de]activate and reactivate" Special Conditions 31 and 32 regardless of his "ability to pay the fee" reflected "an unreasonable delegation of authority" and "virtually unlimited discretion." Negrón is correct that the Probation Office suspended the monitoring-software requirement in February 2022, when Negrón was newly released from prison and homeless. At that time, Officer Mojica told him that he could use a smartphone without monitoring software "until he could secure employment to cover the monitoring cost." The Probation Office's actions, however well-intentioned, were clearly inconsistent with Special Condition 32. But even so, Special Condition 32 itself did not authorize the Probation Office to determine if and when such monitoring software would be required, so we see no basis to

invalidate that condition.  See, e.g., id. (vacating the drug-testing provision giving rise to the unauthorized action).

Second, Negrón argues that the Probation Office's imposition of a 44-paragraph contract governing internet usage, titled the "Computer & Internet Management Program" (CIMP), is an unlawful expansion of his punishment.  Generally, CIMPs assist the Probation Office with "mandat[ing] compliance" with a defendant's conditions of supervised release.  United States v. Stergios, 659 F.3d 127, 134 (1st Cir. 2011) (quoting Sebastian, 612 F.3d at 52).  And although certain provisions of a CIMP could theoretically exceed the Probation Office's delegated authority, Negrón fails to identify any provisions that do so here.[9]  In any event, Negrón never signed the CIMP at issue in this case, so the CIMP was never enforced against him.  Thus, his challenge depends on "future factual contingencies" -- like how the CIMP would be enforced, or which provisions would be invoked -- that render it "not ripe for our review."  Hood, 920 F.3d at 94.

_____

[9]  Negrón mentions in passing that the CIMP unlawfully restricts him to one internet-connected device.  The CIMP appears contradictory on that point, with one provision stating that Negrón "shall only possess Internet-capable devices approved by the Probation Officer" and another stating that Negrón "shall not use any other Internet-capable device than the one you have been authorized to use."  As we explain, Negrón may file a motion to clarify his supervised release conditions under 18 U.S.C. § 3583(e)(2) if he is unable to agree on the scope of the conditions with the Probation Office.

And we note that Negrón has recourse "should the
probation officer abuse the discretion delegated to her." United
States v. Mercado, 777 F.3d 532, 537 (1st Cir. 2015). A district
court may modify, enlarge, or reduce a supervised release condition
under 18 U.S.C. § 3583(e)(2). Thus, Negrón can always request
relief from the district court if the Probation Office is
"attempting unreasonably or unnecessarily" to enforce a particular
condition. Mercado, 777 F.3d at 537. Such relief may be
appropriate if further disputes arise concerning Negrón's "ability
to pay" the monitoring software fee; Negrón is slated to serve 22
years and four months of supervised release following his current
prison term, which may result in a substantial cost for the
monitoring software.

### III.  CONCLUSION

For all these reasons, we **<u>affirm</u>** the Second Revocation
judgment and sentence.[10]

---

[10] Negrón also makes two procedural requests on appeal, which
we deny. First, he asks that we reverse the district court's
supposed denial of his motion to access his mental health report.
But the district court never decided that motion. Rather, in
response to the motion, it indicated in a docket entry "[n]oted."
So with no order to review, we lack appellate jurisdiction to go
any further. See United States v. Kouri-Perez, 187 F.3d 1, 13
(1st Cir. 1999).

Second, Negrón requests that we remand the case to a different
district judge. Because there was no reversible error, we decline
to do so. See United States v. Castillo-Torres, 8 F.4th 68, 73
(1st Cir. 2021).